Finley v. Keisling.

MAGGIE D. FINLEY *v.* A. G. KEISLING *et al.**

(*Nashville.* December Term, 1924.)

MASTER AND SERVANT. Contractor cutting and hauling timber held
employee, and not independent contractor, and owners were liable for
death of his workman.

S., who contracted to cut and haul timber as directed by defendants
at specified price per thousand feet, was defendants' employee, and
not independent contractor, where defendants had right to say
when and where he should begin and cease cutting, and generally
to direct and supervise work, and defendants were therefore liable
for death, in course of employment, of employee hired and paid by
S.

Acts cited and construed: Acts 1919, ch. 123.

Case cited and approved: Gall v. Detroit Journal Co., 19 A. L. R., 1172.

Cases cited and distinguished: Railroad v. Cheatham, 118 Tenn., 173;
Indiana Iron Co. v. Cray, 19 Ind. App., 565.

*Headnote. Master and Servant, 26 Cyc., p. 1548.

FROM OVERTON.

Appeal from the Circuit Court of Overton County.—
HON. C. E. SNODGRASS, Judge.

C. J. CULLOM, for Finley.

E. C. KNIGHT and CHAS. L. NEELY, for Keisling.

*On circumstances under which the existence of the relationship of
employer and independent contractor is predicable, see note in 19 A. L.
R. 629.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

This is a suit by Mrs. Finley, under the Workmen's Compensation Act (Pub. Acts 1919, chapter 123), to recover for the death of her husband, upon allegations that he died from injuries received while in the employ of the defendants, a partnership.

On April 30, 1923, the defendants purchased a boundary of timber from Hilery Carr, and erected a sawmill upon the land for the purpose of manufacturing the timber into lumber.

On January 30, 1924, the defendants entered into a written contract with C. L. Swafford to cut the timber on said land and deliver same to its mill.

Subsequently, Swafford contracted with Luther Eldridge to cut the timber for $1.75 per thousand feet. Eldridge employed plaintiff's husband, R. D. Finley, to assist him in felling the timber. While so employed he was injured by being struck by a limb and died within a few hours.

The determinative question, according to the contention of counsel, is the relationship which Swafford bore to the defendants, it being conceded, in effect, that if Swafford were an independent contractor the plaintiff cannot recover, but that if he were a servant of defendants she can recover.

The contract between Swafford and the defendants is as follows:

"Livingston, Tenn., 1/30/24.

"Article of agreement entered into by and between A. G. Keisling Lumber Co., party of the first part, and

151 Tenn.—30.

Charlie Swafford, party of the second part. Second party agrees to cut and deliver on a yard near a pond on the land of Hilery Carr, as designated by first party, all the timber bought of the said Carr by first party,. to cut and haul said timber as directed by said first party, to put eight mules on the job, and use reasonable diligence in trying to keep sufficient logs at mill to run same. First party agrees to pay to second party for the cutting and delivering said logs at mill, the sum of $5.25 per M. Doyl-Scribner Log rule, to be paid from time to time as logs are delivered.

"This contract made in duplicate, each party holding copy. A. G. Keisling Lbr. Co., by A. G. K.

"C. L. SWAFFORD."

We wish to emphasize the provision of the contract which says, "To cut and haul said timber as directed by said first party."

The defendant firm was composed of B. B. Ledbetter, A. G. Keisling, and J. H. Keisling, who were doing business under the style of A. G. Keisling Lumber Company. Ledbetter looked after the cutting and hauling of the timber.

Swafford testified as follows:

"By the Court: Who directed them where to cut and how to cut the timber?

"A. Mr. B. B. Ledbetter was my overseer.

"Q. Was he there on the premises from time to time?

"A. Yes, sir; he was there most of the time.

"Q. Did you hear him giving any directions to these men who was cutting the timber?

"A. I don't remember; he was about the works, and sometimes maybe he would pass where we was logging:

I don't remember whether or not I ever heard him tell them where to cut.''

Witness testified on cross-examination as follows:

''Q. Mr. Ledbetter, when we wrote this contract, he wanted the right to rule the cutting?

''Q. The length the timber was to be cut?

''A. Yes, sir.

''Q. What timber to cut and the length to cut it?

''A. I imagine the way he talked, if he wanted certain timber cut, he wanted the right to have it cut.

''Q. What length and what timber to cut, whether or not beech, oak, or whatever it was?

''A. Yes, sir.

''Q. And the lengths to cut?

''A. Yes, sir.

''Q. He did not exercise the right to hire or fire your men, and he did not pay your men?

''A. I understand the right and so on; he wanted to boss the cutting and wanted me to boss it.

''Q. He wanted to boss the lengths and the kind of timber he wanted out?

''A. Yes, sir.

''Q. That is what he specified?

''A. He did not say for certain; he did not say anything about the kind; he said he wanted the right or the say so about cutting the timber.

''Q. He did not hire your men?

''A. No, sir.

''Q. He did not hire Mr. Eldridge, and he did not pay your man or Mr. Eldridge?''

Witness testified on re-examination as follows:

"Q. Did your contract provide that Mr. Ledbetter was to have control and direction of the cutting of the timber?

"A. Yes, sir. I am not certain whether or not it was drawn that way in the contract.

"Q. I will ask you, who directed Mr. Eldridge in the cutting and getting out of the logs ready for you to haul to the mill?

"A. Mr. Ledbetter.

"Q. Did you give him any direction in reference to that, or at any time attempt to do so?

"A. No, sir; Mr. Ledbetter did all that. All I looked after was the logging."

Witness testified on re-cross examination as follows:

"Q. Did Mr. Ledbetter give you any directions about the cutting, etc.?

"A. I am not certain; he come up there and asked me about hauling certain stuff; asked me if I could get it out; I said I guessed I could cart it out.

"Q. He wanted the logs cut a certain length?

"A. He wanted them 26 feet.

"Q. Was it a special bill of lumber he had?

"A. Yes, sir."

Witness was recalled, and testified as follows:

"Q. What did you say the provisions of your contract were in reference to cutting the timber?

"A. When I made the trade—I don't know whether or not there was any written contract—when I made the trade, Mr. Ledbetter wanted the right to sort of control the cutting; I will not say that is in the contract; I have forgot all about how the contract reads; I could not tell."

Luther Eldridge testified as follows:

"Q. Who looked after and managed and controlled the cuttting of that timber?

"A. Well, I was the one that sort of looked after it most of the time; Mr. Ledbetter would show me and change me from one place to another on the job; he would tell me what to cut and the lengths to cut, and moved me from place to place about cutting the timber.

"Q. What directions did Mr. Ledbetter give you with reference to cutting the timber?

"A. Nothing more than he changed me from one place to another about cutting the timber; there was a little hollow he wanted the timber cut in there first in order to get rid of it—get it cut before the sap came up; he changed me back and forwards on that. I worked to his advantage, and he tried to do the same with me."

On cross-examination witness testified as follows:

"Q. The only trade you had, Mr. C. L. Swafford was to furnish the tools to you and pay you $1.75 per thousand feet?

"A. Yes, sir; he did that very thing.

"Q. The only relation you had with Mr. B. B. Ledbetter was that he was to tell you he would come out and say, that this timber ought to be cut certain lengths, and this timber ought to be cut next, and certain timber at certain other places ought to be cut next?

"A. Yes, sir; he would have bills for long stuff and bills for short stuff.

"Q. He would tell you that they needed certain timber at the time according to some contract they had to cut the timber; was that it?

"A. Yes, sir."

"Q.   He would tell you the length he wanted it cut?

"A.   Yes, sir, and he would come out to see whether or not I cut it right. I had not cut much timber for him; I had worked a little for him before that time.

"Q.   He told you where to cut the timber and what lengths to cut it, but he did not come and tell your men to get off the job, that he did not want them, but would simply tell you about what timber to cut and where and the lengths?

"A.   Yes, sir."

"Q.   You just cut certain lengths and at certain places he told you?

"A.   Yes, sir."

B. B. Ledbetter testified as follows:

"Q.   Did you ever give them any instruction of any kind. If so, what were those instructions?

"A.   Probably; sometimes I would go out where Mr. Eldridge was cutting and tell him about certain kind of logs we would want. I give Mr. Eldridge some instructions, I think, about the lengths—something like that. One time I remember they were falling short in the lengths. I went out in the woods and told him about it. For instance, a sixteen-foot log would be less than sixteen feet; something wrong with the measurements."

Witness testified on cross-examination as follows:

"Q.   Did you ever tell them to go and cut certain timber before the sap rose?

"A.   I would not say; I don't remember that I did."

A. G. Keisling testified as follows:

"Q.   What were the provisions of that contract?

"A.   Well, of course, I cannot give the contract verbatim, but the contract was that Mr. Swafford was to

cut and haul or log the timber to our millyard at $5.25 per thousand feet, I think it was the contract called for. And the contract provides further that the cutting of this timber and the logging, or more especially the cutting, was to be done under the directions of the A. G Keisling Lumber Company; that is, they should cut the timber when we said, and cut it as we said, and such timber as we wanted cut; that is the provisions of the contract; I don't know the exact words, but that was the intention of the contract. In other words, we were to name the kind of timber, the certain grades or kind, and the certain lengths that we wanted cut, certain bill of stuff, long stuff or short stuff.

"Q. That is the provisions of the contract?

"A. Yes, sir."

On cross-examination witness testified as follows:

"Q. According to your statement of what the contract was, you had absolute control of the cutting of the timber?

"A. We had control; as I told you it would be cut when we said cut it, and kind of timber; that is, kind of trees that were to be cut; well, we did not go around and pick out every tree; occasionally Mr. Ledbetter would go through the woods and see a tree that ought to be cut, and he would give orders to cut it and to have it cut in certain lengths. That was the only authority we exercised in cutting the timber.

"Q. Under the provisions of this contract you could have stopped these men at any time?

"A. I think so. That was the intention of it. If the market conditions got so bad that we had to shut down

the mill, we had a right to stop the cutting and logging of the timber.

"Q. You had absolute control of that part of it, the management of the cutting and the logging, when it was to be done and how?

"A. Yes, sir; as to that part of it, we had control. I think the contract reads that the second party shall cut the timber under the directions of the first party."

"An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer, except as to the result of his work. The employer of such a contractor, if he be a fit and proper person, and the work be not in itself unlawful or a nuisance in itself, or necessarily attended with danger to others, will not be responsible for his negligence, or that of his subcontractors, or his servants." *Railroad* v. *Cheatham,* 118 Tenn., 173, 100 S. W., 905.

"One who contracts to do a specific piece of work, furnishing his own assistants, and executing the work either entirely in accordance with his own ideas, or in accordance with a plan previously given to him by the person for whom the work is done, without being subject to the orders of the latter in respect to the details of the work, is an independent contractor, and not a servant." 26 Cyc , 970.

"Where the relation between the parties is that of contractor and contractee, and not that of master and servant, the contractee is not liable for injuries to the contractor's servants caused by the latter's negligence, unless he has retained direction and control of the work,

or himself furnishes the machinery and appliances, or unless the negligence consists in a duty which cannot be delegated. And the same rules apply as between a contractor and subcontractor." 26 Cyc., 1084.

"The accepted doctrine is that, in cases where the essential object of an agreement is the performance of work, the relation of master and servant will not be predicated, as between the party for whose benefit the work is to be done and the party who is to do the work, unless the former has retained the right to exercise control over the latter in respect to the manner in which the work is to be executed. This attribute of the relation supplies the single and universally applicable test by which the servants are distinguished from independent contractors." 1 Labatt's Master & Servant (2 Ed.), 222.

"An independent contractor is not, in any proper legal sense, a servant of his employer, but is one exercising an independent employment under a contract to do certain work by his own methods, without subjection to the control of his employer except as to the product or result of the work. . . . It has been said that the test is, who has the general control of the work? Who has the right to direct what shall be done and how to do it?" *Indiana Iron Co.* v. *Cray*, 19 Ind. App., 565, 577, 48 N. E., 803, 807.

The authorities generally hold that the mere fact that the laborer is receiving so much by the piece or job does not control the question as to whether the contractee was an independent contractor or a servant.

A number of cases could be cited to the effect that where one employs another to cut and haul timber at so much per thousand feet, the contractee is an independ-

ent contractor. But in these cases it is usually said, in effect, that the contract was one under which no power of direction or supervision was reserved by the employer.

A great many cases dealing with the question of independent contractors will be found in the annotations to *Gall* v. *Detroit Journal Co.*, 19 A. L. R., beginning on page 1172.

In the case under consideration, Swafford was "to cut and haul said timber as directed by said first party." In addition to this express provision of the contract, the evidence shows, without conflict, that the defendants had the right to say when they should begin cutting; when they should cease; where they should cut; to shift them from one place to another; to designate the character of timber to be cut; the lengths into which the logs were to be sawed, and, generally, to direct and supervise the cutting of the timber. No instance occurs to us in which the authority of the defendants, with respect to this matter, was not paramount. It is true that they did not hire and pay the parties who worked under Swafford, but that matter is not the sole criterion in determining the relationship of the parties. There was no agreement one way or the other as to the right of the defendants to discharge employees, but it is evident, under the contract, that if the work were being done in an unskilled or unworkmanlike manner the defendants had a right to direct how it should be done. And we see no reason why under the broad provisions of the contract, the defendants did not have the right to say how far from the ground the trees should be severed, or in what direction they should be felled, what part of the trees should be cut out on account of defects, and to direct Swafford in

any other matter relative to the cutting and hauling of said timber.

Taking the record as a whole, we are unable to escape the conclusion that Swafford was the servant of the defendants and was obligated to do this work strictly according to the instructions of the defendants. Where the power to direct and supervise the work is reserved, under practically all of the authorities, the contractee is a servant, and not an independent contractor.

The trial court was of the opinion that Swafford was an independent contractor. In this we think he was in error, and for these reasons we feel constrained to reverse the case and decree liability against the defendants. The indemnity Company was also made a defendant to the suit.

If counsel can agree as to the amount, a decree will be entered here, otherwise the case will be remanded to the circuit court of Overton county, for the purpose of entering a decree for the proper amount.

The defendants will be taxed with the costs.