TEMPEY J. FROST *v.* BLUE RIDGE TIMBER CORPORATION,
*et al.**

(*Knoxville.* September Term, 1928.)

Opinion filed December 8, 1928.

*As to whether independent contractor is workman or employee, within the meaning of Workmen's Compensation Acts, see annotation in L. R. A., 1916A, 118, 247; L. R. A., 1917D, 148; L. R. A., 1918F, 206; 28 R. C. L., 762; 3 R. C. L. Supp., 1593; 4 R. C. L. Supp., 1847; 6 R. C. L. Supp., 1748.

JENNINGS, SAXTON & WRIGHT, for complainant, appellee.

HODGES & CREEKMORE, for defendant, appellant.

MR. JUSTICE SWIGGART delivered the opinion of the Court.

The Blue Ridge Timber Corporation and its insurer, American Mutual Liability Insurance Company, have prosecuted their appeal in the nature of a writ of error from a decree of the Chancery Court of Knox County sustaining the claim of Mrs. Frost, as the widow of John N. Frost, for compensation for the death of her husband, under the Workmen's Compensation Law, Acts 1919, chapter 123.

The defenses interposed to the claim for compensation are: First, that John N. Frost was not an employee of the Blue Ridge Timber Corporation at the time of his death, but sustained the relation to the Corporation of an

independent contractor, so as not to be within the protection of the compensation statute; and, second, that the death of John N. Frost was the result of an injury due to his wilful misconduct and intoxication.

There is no material controversy in the evidence as to the facts. The Blue Ridge Timber Corporation was engaged in a general logging and lumber business, and had a number of men at work hauling lumber from a mill to a shipping point, a distance of four miles. Frost, as well as a number of other men, was engaged to do this hauling and was paid according to the number of feet of lumber he hauled. The work was under the general charge and supervision of J. A. Tindell, who was the superintendent and foreman of the corporation, assisted by an inspector, whose only duty seems to have been to measure and report the quantity of lumber hauled by each man. Frost furnished his own team, and Tindell testified that he did not exercise any control over Frost as to the number of loads he carried nor the quantity of lumber on each load, nor as to the number of days he worked. Tindell's only description of the contract with Frost was "his contract was to haul lumber at so much per thousand feet." Frost was required to load and unload the lumber he hauled, without assistance from the Corporation.

It was further proven that the Corporation paid more for hauling certain kinds of lumber than for other kinds, and Tindell, as superintendent of the Corporation, designated which lumber should be hauled. He further urged the men from time to time "to make all the trips they could, and would push them to get out the lumber;" and told them on one occasion that if they "could not get the lumber out with them teams that he would put some teams there that could."

The superintendent did not testify that the Corporation did not have the right to direct and control in detail the hauling of the lumber from the mill to the shipping point. He testified only that the Corporation did not, in fact, exercise such control. He did not testify that the contract with Frost was for the hauling of any stated amount of lumber or for any definite period of time. He testified only that Frost was employed "to haul lumber at so much per thousand feet." There is nothing in this description of the contract to negative the reservation by the corporation of the right to terminate the employment at any time, with or without cause, or to control and direct the means and method of the hauling at any time it saw fit to do so, so long as the employment should last. The statement of the superintendent, in urging that the work be hurried, that he would put other teams to work in the stead of those already employed, indicates this conception of the contract by the superintendent, and there is nothing on the record to suggest the contrary.

(1) It appears to the court, therefore, that the contract of employment was one by which the employer simply agreed to pay Frost for hauling the lumber according to the amount hauled, with no relinquishment by the employer of the right to control the means and method by which the hauling was to be done. While working under such a contract Frost was an employee and not an independent contractor, in so far as the application of the compensation law to the contract of employment is concerned. *Siskin* v. *Johnson,* 151 Tenn., 93; *Finley* v. *Keisling,* 151 Tenn., 464; *Odom* v. *Sanford & Treadway,* 156 Tenn., 202.

In *Finley* v. *Keisling, supra,* this court said: "The authorities generally hold that the mere fact that the laborer is receiving so much by the piece or job does not control the question as to whether the contractee was an independent contractor or a servant.

"A number of cases could be cited to the effect that where one employs another to cut and haul timber at so much per thousand feet, the contractee is an independent contractor. But in these cases it is usually said, in effect, that the contract was one under which no power of direction or supervision was reserved by the employer."

And in the same case the court further said: "Where the power to direct and supervise the work is reserved, under practically all of the authorities, the contractee is a servant, and not an independent contractor."

In *Odom* v. *Sanford & Treadway, supra,* this court quoted with approval from Ruling Case Law (vol. 14, p. 67): "In this connection, the ultimate question is not whether the employer actually exercises control over the doing of the work, but whether he has the right to control."

And again: "The power of an employer to terminate the employment at any time is incompatible with the full control of the work which is usually enjoyed by an independent contractor, and hence is considered as a strong circumstance tending to show the subserviency of the employee. Indeed, it has been said that no single fact is more conclusive, perhaps, than the unrestricted right of the employer to end the particular service whenever he chooses, without regard to the final result of the work itself." 156 Tenn., 210, quoting from 14 R. C. L., p. 72.

The two circumstances mostly relied upon by the employer to place Frost in the *status* of an independent con-

tractor are the fact that he was paid according to the amount of work done, and the fact that the employer's superintendent did not exercise control over the amount of work done. These circumstances are not conclusive, as is clearly indicated by the authorities cited, since they do not exclude the employer's right to control or to terminate the employment at will.

The Corporation relies upon *Chair Company* v. *Kerr*, 130 Tenn., 159, holding that a person having a similar contract to that of Frost would not fall within the application of section 3564 of Shannon's Code (all editions), creating a lien for wages or compensation upon the property of corporations and partnerships in favor of their "employees and day laborers." The case is not authority here, for the reason that the court confined the terms of the statute to employees who might be considered as servants, to the exclusion of a contractor, whether an independent contractor or not; and the court did not find it necessary in that case to set out the facts of the employment in such detail as to indicate whether the persons claiming liens were "independent contractors."

In the cases hereinabove cited the term "employee," as used in the compensation statute, has been given a much broader meaning than the same term, as used in the lien statute, was given in *Chair Company* v. *Kerr, supra,* the reason for the more restricted use of the term in the latter statute being clearly indicated in the opinion of the court construing it.

(2) Learned counsel for the Corporation further refer to the cases construing mechanics' lien statutes, holding that such statutes should be strictly construed in the determination of the parties entitled to the lien, and urge a similar rule with respect to the compensation statute.

The contrary policy has been followed by this court consistently in construing the compensation statute. *Johnson Coffee Co.* v. *McDonald,* 143 Tenn., 505; *Portin* v. *Portin,* 149 Tenn., 530; *Cherokee Brick Co.* v. *Bishop,* 156 Tenn., 168.

*(3)* The second defense interposed by the employer to the claim for compensation is grounded upon the provisions of section 10 of the Compensation Law (Acts 1919, chapter 123), which provides that compensation shall not be allowed "for an injury or death due to the employee's wilful misconduct . . . or due to intoxication."

This section further provides that "the burden of proof shall be on the employer to establish such defense."

The proof in this cause shows that Frost, an elderly man, had hauled four or five loads of lumber on the day on which he was killed, and in the late afternoon had stopped for half an hour at the home of a friend, where he listened to a victrola record and danced a clog dance. The two persons at this home testified that Frost showed no signs of intoxication. Frost left this place, standing on top his load of lumber, which the proof shows was not an unusual method of driving. His team was an exceptionally spirited pair of mules. When the team and wagon passed in front of the next house, the team was running, and a short distance beyond, Frost was later found in the road suffering from injuries occasioned by the passing of a wagon wheel over his body, and a fractured skull. The team proceeded home, where they lodged the wagon against a tree or post, and an examination revealed that the bridle bit of the lead mule had been broken in two. The only evidence that Frost was intoxicated is the testimony of a physician, who reached him before he died, that his breath smelled of whisky,

and evidence that the man first reaching him had given a statement that Frost was drunk. This man, however, testified on the trial that he saw no signs of intoxication and was not sure that he smelled whisky. It was affirmatively shown that no whisky was found on or near Frost.

Conceding that Frost's breath smelled of whisky, there is affirmative evidence that within a very few minutes before the accident he showed no signs of being intoxicated; nor is there any evidence that the accident was the result of intoxication. The proof that the team was spirited and that the bit of one of the bridles was broken would amount to some evidence that the running away of the team and the resultant injury to Frost were the result of the broken bit. The Chancellor was justified in taking this view of the cause, especially since the burden of proving the contrary is cast upon the employer by the statute.

We find no error in the decree of the Chancellor, and it will be affirmed.