OLIVER MAYBERRY *v*. BON AIR CHEMICAL COMPANY.

(*Nashville,* December Term, 1929.)

Opinion filed April 5, 1930.

460

Connor Bates, for complainant, appellee.

W. A. Knight, for defendant, appellant.

Mr. Justice McKinney delivered the opinion of the Court.

Petitioner, Oliver Mayberry, while cutting cordwood for the defendant, was struck in the eye by a chip resulting in the loss of his eye.

The chancellor found that petitioner's average weekly wage was $4.49, and awarded him that sum for one hundred weeks together with $50 to cover medical expenses.

It is insisted by the defendant that the petitioner is an independent contractor rather than a servant. The petitioner was employed by Thomas Whitson, the cordwood superintendent of defendant, to cut wood, for which he was to receive $1 per cord. He had been cutting about six months when he was injured.

The petitioner testified as follows:

"Q. Now you say Mr. Thomas Whitson was working for the same company? A. Yes, sir.

"Q. What was his business, do you know? A. He looked after wood, taken up wood, tells us how to cut and where to cut.

"Q. Did you have an agreement with Mr. Whitson representing this company, agreement as to how much wood you were to cut? A. No; sir.

"Q. Did you have an agreement that you were to cut over so much land? A. No, sir.

"Q. Did this company have a right to stop you from cutting wood at any time? A. Yes, sir.

"Q. Did they have a right to move you from one place to another, at any time? A. Yes, sir.

"Q. Did they have a right to cut the price they were to pay for cordwood? A. Yes, sir.

"Q. And did they cut it while you were working for them? A. No, sir, I don't remember them cutting the price while I was working for them; they did cut it for a

dollar, but I was still getting $1.25. . . .

"Q. I believe you already stated that Mr. Whitson employed you? A. Yes, sir.

"Q. He told you where to go to work? A. Yes, sir.

"Q. And told you what you would get? A. Yes, sir."

On cross-examination he was questioned as follows:

"Q. Anybody bossing you? A. No boss there; Mr. Whitson took up our wood.

"Q. Nobody was there when you were cutting to tell you how to cut or what to cut; you just went in there, you and Dan together cut the wood, and then about every two weeks Mr. Whitson come and took it up? A. Whatever wasn't cut right he would dock it; and he would tell us what to cut and how much to cut.

"Q. Tell you how long to cut it? A. Yes, sir.

"Q. All to be cut the same length? A. Yes, sir.

"Q. To be cut four feet in length, you knew that? A. Yes, sir.

"Q. You knew that it had to be four feet high and eight feet long, that made a cord? A. Yes, sir. . . .

"Q. Is that all he did, come in there and measure your wood, see how many cords you had, and you go to the office and draw your pay? A. See it was cut right and give us a measuring stick to cut it by; we done just as he said about the wood."

Petitioner further testified on redirect examination:

"Q. I believe you say he went out and give you a measuring stick? A. Yes, give us a measuring stick.

"Q. He give you a measuring stick, where were you when he give the measuring stick? A. We were up there on the hill, where I got hurt at.

"Q. Was he up there when he give the measuring stick? A. Yes, when he come to take up the wood.

"Q. Where was he when he give the measuring stick? A. Up in the woods.

"Q. And he showed you how and where to cut it? A. Yes, sir.

"Q. And then of course you cut it and he came around and took up the wood? A. Yes, sir.

"Q. And if you didn't cut it according to what he said, you were docked? A. Yes, sir."

A very terse definition of Master and Servant is given in 39 Corpus Juris, 1269, as follows:

█ "The relation of master and servant exists where the employer selects the workman, and may remove or discharge him for misconduct, and may order not only what work shall be done, but the mode and manner of performance."

█ The fact that the employee is paid by the cord instead of by the day does not control the question as to whether the employee was an independent contractor or a servant. *Finley* v. *Keisling,* 151 Tenn., 464; *Frost* v. *Blue Ridge Timber Co.,* 158 Tenn., 18.

█ It has also been said by this court that "the ultimate question is not whether the employer actually exercises control over the doing of the work, but whether he has the right to control." *Odom* v. *Sandford & Treadway,* 156 Tenn., 202; *Frost* v. *Blue Ridge Timber Co., supra.*

█ In *Sledge* v. *Hunt,* 157 Tenn., 610, it was held that there is a presumption that one performing ordinary work for another is a servant, and the burden is upon the employer who seeks to be relieved from liability arising from such employment to show that the employee was an independent contractor.

█ When a party simply states to another that he will give him one dollar a cord to cut wood, or one cent a

pound to pick cotton, or fifty cents an acre to break land, the relationship thus created is that of master and servant. Such an agreement does not contemplate a relinquishment of the right to direct the work and to control the means and methods by which the desired result is attained. The employer expects the employee to do the work according to his instructions and under his direction, and rightfully discharges him if he fails to do so.

When an unskilled person needs the services of a mechanic, such as a builder, electrician or plumber, the employee is ordinarily treated as an independent contractor. In such a case the employer expects the employee to obtain the desired result according to his own means and methods and without control or direction from him. On the other hand, when it comes to employing ordinary unskilled labor the employer expects the work to be done under his supervision and direction, and the relationship thereby created is ordinarily that of master and servant.

In cases of this character the employer must show that he relinquished his right to control and direct the employee, and that the latter was not subject to and did not have to take orders and instructions from him. Where the entire contract is in writing and is definite and unambiguous in its terms, or where the contract rests in parol and the facts are clear and undisputed, the question of the relationship of the parties is one of law. On the other hand, where the evidence is conflicting and more than one inference can be drawn therefrom, the question as to whether the employee is a servant is one of fact. 39 Corpus Juris, 1362, 1364.

In the latter situation the finding of the trial court will not be disturbed if there is any evidence to support it.

■ Applying these principles to the facts of this cause, we not only find evidence to support the finding of the chancellor, but we are of the opinion that the parties contemplated that petitioner was to cut this wood under the direction and instruction of the cordwood superintendent of defendant, and was, therefore, a servant and not an independent contractor.

■ A question is made as to the notice

The petitioner is an ignorant negro who can neither read nor write. The superintendent actually knew of his injury and that he had been taken to a hospital in Nashville, where his eye was removed. Upon his return, and within the thirty days' period, he requested the superintendent to write the company and make claim for him for compensation. He thus constituted the superintendent his agent. The latter testified that he wrote the company, giving full details of the case, and that the company replied, denying liability upon the sole ground that petitioner was an independent contractor.

Upon the facts the chancellor held that the excuse for not giving the statutory notice was excused, and that the defendant, by its conduct, had waived written notice. There was no abuse of discretion in this finding. *Washington County* v. *Evans,* 156 Tenn., 197.

■ The computation by which the average weekly wage was ascertained followed the rule announced in *White* v. *The Pinkerton Company,* 155 Tenn., 229.

The petitioner began cutting wood in October, 1924, and was injured on either the 3d or 5th of April, 1925. During that period he earned $81.25. He cut no wood in November, 1924. It does not appear for certain whether he worked eighteen or nineteen months, due to the fact that the date he began cutting wood in October, 1924,

does not definitely appear. On October 30, 1924, he was paid $4.75, which, under the evidence, tends to indicate that he only worked one week in that month. If that is true, then he only worked eighteen weeks in all, and his average weekly wage was $4.51, two cents more than was allowed him. The difference in controversy is small, and we are satisfied that the chancellor reached a just result. It follows that his decree will be affirmed.