## CHAPMAN et al. v. EVANS et al. (two cases).—261 S. W. (2d) 132.

Middle Section.   March 27, 1953.

Petition for Certiorari denied by Supreme Court, July 17, 1953.

Rehearing denied October 9, 1953.

J. Connelly Edwards, of Nashville, for plaintiffs in error.

Hume, Howard, Davis & Boult, Charles L. Cornelius, Jr., and Geo. H. Armistead, Jr., all of Nashville, for defendants in error.

HOWELL, J. These two suits, filed by Mrs. Elizabeth Chapman and her husband Ozro Chapman against Luther Joseph Evans, Ed Wall and Warren Brothers Roads Company, were for bodily injuries sustained by Mrs. Chapman and resulting expenses to Mr. Chapman, growing out of an accident when a truck being driven by Luther Joseph Evans, owned by Ed Wall, ran into another truck from which Mrs. Chapman was alighting at the time of the collision. All three defendants filed pleas of not guilty.

The plaintiffs by proper procedure have appealed in error from the action of the trial Judge in granting the motion of the defendant Warren Brothers Roads Company and dismissing the suits as to it and have filed assignments of error.

It is insisted for the plaintiffs that the trial Court erred in sustaining the motion of the defendant Warren Brothers Road Company and in dismissing their suits as to this defendant.

The motion for a directed verdict was granted at the close of plaintiffs' proof.

Therefore the question for determination in this Court is whether or not the Court erred in granting the motion of the defendant Warren Brothers Roads Company.

The applicable law is well stated in an opinion of this Court in the case of McMahan v. Tucker, 31 Tenn. App. 429, 216 S. W. (2d) 356, 360, where it is said:

"The principles applicable to directed verdicts have been so frequently announced that there can be no doubt as to the duty of this Court in considering the facts. The cases upon this subject are too numerous to be collated here. One of the latest and most concise statements upon this subject is found in the case of Tennessee Central Ry. Co. v. McCowan, 28 Tenn. App. 225, 188 S. W. (2d) 931: 'Upon the consideration of a motion made by defendant for directed verdict "plaintiff is entitled to all legitimate inferences of fact favorable to him which may be reasonably drawn from the evidence tending to support the cause of action stated in his declaration". Prudential Ins. Co. (of America) v. Davis, 18 Tenn. App. 413, 429, 78 S. W. (2d) 358, 368; and "the trial judge should take the most favorable view of the evidence supporting the rights asserted by the party against whom the motion is made, and discard all countervailing evidence," Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn. 551, 249 S. W. 984, 985.' "

It is noted that the two defendants against whom the verdicts of the jury were rendered were called as witnesses for the plaintiffs.

It is from the testimony of these two witnesses that the question must be determined whether or not the defendants Wall and Evans were independent contractors or employed by Warren Brothers Roads Company. It would lengthen this opinion too much to quote from this testi-

mony. We have carefully read and reread and considered this evidence and are of the opinion that the defendant Ed Wall was the owner of the truck involved and hired the defendant Evans to drive for him, that Wall had an agreement with the Warren Brothers Roads Company to do some hauling for it and was to be paid a fixed price per ton for such hauling, that the truck was used in hauling for others and was not regularly hauling for Warren Brothers Roads Company but Wall would communicate with this defendant from day to day to find out if they wanted his truck to do any hauling the following day. The truck was the property of Wall and registered in his name and Evans was the employee of Wall. On the day of the accident Evans, driving Wall's truck, had made a delivery of some asphalt from the Warren Brothers Roads Company plant to the Franklin Lime Stone Company and was on his way to his home when the accident happened. The driver Evans did not get any instructions from the Warren Brothers Roads Company as to the hauling. His instructions were given by Wall. The Warren Brothers Roads Company had no control over the truck or the driver and the driver acted under directions from his employer Wall.

We think the record fully justifies the conclusion that in the operation of this truck Wall was not in the employ of Warren Brothers Roads Company but only did some hauling for them under an agreement that he should be paid so much per ton and that Evans was employed by Wall and not by Warren Brothers Roads Company.

There are many cases relied on and discussed by counsel in their briefs and arguments. Each case must be determined upon the facts as shown by the record and many of the cases cited can easily be distinguished from the case before us.

We do not think that the record in this case would justify the conclusion that the Warren Brothers Roads Company had a right to control Wall or Evans in so far as their hauling for it was concerned except as to the results. It had no control over Evans the driver of the truck. The truck driver Evans was not on the business of the Warren Brothers Roads Company, but was working for Wall. At the time of the accident he had completed his hauling for the day and was on his way home.

In the case of Grace v. Louisville & N. R. R. Company, 19 Tenn. App. 382, 89 S. W. (2d) 354, 357, this Court said:

"It is familiar law that an 'independent contractor' is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to control of his employer, except as to the result of his work. The ultimate question is not whether the employer actually exercises control but whether he has the right to control of essential details. Gulf Refining Co. v. Huffman & Weakley, 155 Tenn. 580, 297 S. W. 199; Powell v. [Virginia] Construction Co., 88 Tenn. 692, 13 S. W. 691, 17 Am. St. Rep. 925; Mayberry v. Bon Air Chemical Co., 160 Tenn. 459, 26 S.W. (2d) 148; Morgan Lumber Co. v. James, 14 Tenn. App. 305. Merely denominating one an 'independent contractor' does not make him so. Chunn v. Memphis Flooring Co., 7 Tenn. Civ. App. 532. In every case the decisive question is: Had the defendant the right to control in the given particular the conduct of the person doing the wrong? Phillips v. Tenn. Eastman Corp., 160 Tenn. 538, 26 S. W. (2d) 1051; Powell v. [Virginia] Construction Co., supra.

"In Standard Oil So. v. Parkinson, 8 Cir., 152 F.

681, 682, the rule was more elaborately stated as follows:

" 'The test of one's liability for the act or omission of his alleged servant is his right and power to direct and control his imputed agent in the performance of the causal act or omission at the very instant of the act or neglect. There can be no recovery of a person for the act or omission of his alleged servant under the maxim, "respondeat superior," in the absence of the right and power in the former to command or direct the latter in the performance of the act or omission charged, because in such a case there is no superior to respond. Brady v. Chicago & Great Western R. C., 8 Cir., 114 F. 100, 107, 57 L. R. A. 712; Atwood v. [Chicago, R. I. & P.] R. Co., C. C., 72 F. 447, 454, 455; Byrne v. [Kansas City, Ft. S. & M.] R. Co., 6 Cir., 61 F. 605, 608, 24 L. R. A. 693; Hilsdorf v. City of St. Louis, 45 Mo. 94, 98, 100 Am. Dec. 352; Town of Pawlet v. Rutland & W. R. Co., 28 Vt. 297, 300; Miller v. [Minn. & N. W.] R. Co., 76 Iowa 655, 659, 39 N. W. 188, 14 Am. St. Rep. 258; Wood, R. R., Sec. 388; Donovan v. Construction Syndicate (1893), 1 Q. B. Div., 629; Rourke v. Colliery Co., 2 C. P. Div., 205.'

"All these rules are guides to the proper conclusion from the contract and the situation and conduct of the parties."

We cannot say that the trial court erred in granting the defendant's motion.

The assignments of error are overruled and the judgment of the Circuit Court dismissing the suit as to Warren Brothers Roads Company is affirmed.

Plaintiffs in error will pay the cost of the appeal.

Hickerson, J., concurs.

Felts, J., dissenting.

Felts, Justice (dissenting).

With the utmost deference to my associates I feel bound to record my dissent from their opinion and decision. It seems quite plain to me that the case they rely on, Grace v. Louisville & N. R. Co., supra, is not in point and they overlook later controlling cases of this Court and of the Supreme Court.

Mrs. Chapman was negligently injured by a Ford truck owned by Ed Wall, driven by Luther Joseph Evans, and employed in hauling for the Warren Brothers Roads Company. She sued the three of them, alleging Evans was acting as the servant of the other two. Upon like averments her husband sued to recover for loss of services and for expenses in treating her.

At the close of the evidence for plaintiffs the Trial Judge directed verdicts for the Company and dismissed the suits as to it, upon the ground that the uncontradicted evidence showed that Evans was the servant not of the Company but of Wall, and Wall was an independent contractor employed by the Company to do the hauling. There were verdicts and judgments for plaintiffs against Wall and Evans—$35,000 for Mrs. Chapman and $15,000 for Mr. Chapman. There was no appeal from these judgments.

Plaintiffs appealed in error from the Trial Judge's action in directing verdicts for the Company and dismissing the suits as to it, and insist that this was error because there was evidence on which the jury could reasonably find that Evans was acting as the servant of the

Company, driving the truck in its business, at the time he negligently caused the injuries sued for.

The circumstances under which the truck was employed became the crucial issue. It appears that plaintiffs had no outside proof as to this and could prove it only by calling defendants Wall and Evans as witnesses. Quite naturally, they were hostile witnesses, and the effort to elicit the facts from them met with difficulties and meager results, as will be seen from reading their testimony, the pertinent parts of which are set out below, Appendix, 261 S. W. (2d) pp. 138 to 145.

This evidence, though meager, was enough, in my opinion. To test whether this is true, or whether verdicts should have been directed for defendant Company, we must look to all the evidence, construe it most strongly in favor of plaintiffs, take as true that which supports their rights, discard all countervailing evidence, and allow all reasonable inferences from the evidence in their favor. Tyrus v. Kansas City, Ft. S. & M. R. Co., 114 Tenn. 579, 86 S. W. 1074; Smith v. Sloan, 189 Tenn. 368, 376-377, 225 S. W. (2d) 539, 227 S. W. (2d) 2.

The evidence, so taken and construed, tended to prove, and the jury could well have found, the following facts and circumstances concerning the employment of the truck in hauling for the Company:

The Company was engaged in the business of making and selling asphalt. It had a plant, located on the Franklin Limestone Road in Davidson County, in which it made asphalt and from which it delivered this product to its customers. In the course of its business it hauled to this plant crushed stone, sand, and other materials for making asphalt; and it hauled asphalt from this plant and delivered it to its customers at places desired by them.

It "was short a truck" and hired Wall's truck to help in the hauling of its materials. They had no written contract. Wall maintained the truck and employed and paid Evans to drive it, and the Company paid Wall so much for the materials hauled by the truck, depending on the distance and tonnage. This arrangement was not for any particular part of the hauling, or for any definite time, but could be terminated by the Company at any time.

Wall did not know one day what was to be hauled the next, or whether anything would be hauled by the truck. This was in the control of the Company. Wall said he "Would call up on the phone most every night," and "some of the hands" or "foremen" of the Company would give directions what to haul next day, and he would give the directions to Evans, who usually kept the truck at his home at night.

Evans would report with the truck and haul whatever the Company wanted him to haul—crushed stone, sand, asphalt, or "whatever they needed." Wall did not go with the truck or send any foreman in charge of it. He was not on the job and did not supervise Evans there or tell him what to haul. The Company did that. At times Wall would not even know where or what Evans was hauling for the Company. On the day of the accident he was hauling asphalt from the Company's plant to one of its customers at Smyrna. Wall did not know this until he was told after the accident.

The accident happened at about 5:15 in the afternoon. Evans had driven the truck to Smyrna, delivered his last load for the day, and was returning on the road back to the plant. It was closing time, the plant had closed, and he intended not to stop there but to go on beyond the plant to his home. But the accident happened between Smyrna

and the plant, and he was returning on the road back to the plant when it occurred.

In determining whether one employed to do work for another is a servant or an independent contractor, the test "always is whether the party for whom the work was being done had the right of control in the doing of that work". Brademeyer v. Chickasaw Bldg. Co., 190 Tenn. 239, 246, 229 S. W. (2d) 323, 326.

"An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer, except as to the result of his work." D. M. Rose & Co. v. Snyder, 185 Tenn. 499, 513, 206 S. W. (2d) 897, 903.

Where employment appears, the presumption is that one doing work for another is a servant, and the burden is on the employer, seeking to be relieved as master, to prove that the employee was an independent contractor. He must show that he relinquished his right of control in the doing of the work. D. M. Rose & Co. v. Snyder, supra; Brademeyer v. Chickasaw Bldg. Co., supra; Ely v. Rice Bros., 26 Tenn. App. 19, 23, 167 S. W. (2d) 355.

By these tests, it is clear that Wall was not an independent contractor. He did not contract *"to do a piece of work,"* or to take over the hauling job or any part of it. The Company did not employ him to do all its hauling or any specified part of it. It merely hired his truck with his driver to do such hauling as it directed to be done. That is, it had, and exercised, *"the right of control in the doing of that work."*

The fact that Wall employed and paid Evans and was himself paid so much for the hire of his truck and his driver, Evans, depending on the distance and tonnage hauled, did not make Wall an independent contractor, or

prevent Evans from being the servant of the Company in doing the hauling for it. Brademeyer v. Chickasaw Bldg. Co., supra; D. M. Rose & Co. v. Snyder, supra; Jarratt v. Clinton, 34 Tenn. App. 670, 677, 241 S. W. (2d) 941.

The Company offered no proof that it had relinquished the right of control in the doing of the hauling. On the contrary, the proof was that it had this right and exercised it—that it daily directed what was to be hauled by this truck and driver. Its right to terminate the hiring at will and its right of control in the doing of the hauling exclude the idea that Wall could be an independent contractor in this case. Brademeyer v. Chickasaw Bldg. Co., supra, 190 Tenn. 247, 229 S. W. (2d) 326; Wardrep v. Houston, 168 Tenn. 170, 177, 76 S. W. (2d) 328.

The case of Grace v. Louisville & N. R. Co., 19 Tenn. App. 382, 89 S. W. (2d) 354, 360, relied on by the majority, differs from this case. There the railroad contracted with the transfer company to carry all its freight between its depot and its shippers. The contract was in writing and carefully drawn to make the company an independent contractor. There were no material facts outside the contract and the question stood to be determined upon the contract alone, which was "plain and unambiguous". So it was simply a question of the construction of a writing and the court construed it so as to give effect to the intention of the parties.

In that case the company contracted to do a piece of work, to take over and do all the hauling in its own way, not subject to the railroad's control except as to the end result. In this case there was no contract for any specified hauling, but only an arrangement to do such hauling as the employer directed, which arrangement it could terminate at will. In that case the railroad relinquished

the right of control in doing the work, while in this case the Company not only had such right but exercised it by daily directing what was to be done.

The fact that the driver Evans was the general servant of Wall did not prevent him from becoming the particular servant of the company in doing the hauling for it. "When one person lends his servant to another for a particular employment, the servant, for anything done in that particular employment, must be dealt with as the servant of the man to whom he is lent, although he remains the general servant of the person who lent him." Powell v. Va. Const. Co., 88 Tenn. 692, 701-702, 13 S. W. 691, 694, 17 Am. St. Rep. 925.

In the case before us Wall lent his truck and driver for hire to the Company to help do the hauling for it, and the case falls within the well established common law principle that an employee who is loaned to a special employer, as distinguished from his general employer, and who assents to the change of employment, becomes the servant of the employer to whom he is loaned. Scribner's Case, 231 Mass. 132, 120 N. E. 350, 3 A. L. R. 1178, 1179; Wardrep v. Houston, 168 Tenn. 170, 175, 76 S. W. (2d) 328.

The case of Wardrep v. Houston, supra, is quite in point. There the Vandergriff Company was doing a job of hauling for the paving of a road. It hired from Wardrep three trucks, along with drivers, to help do the hauling. One of the drivers while operating one of the trucks was injured and sued for workmen's compensation. It was held that Wardrep was not an independent contractor and that the driver was the servant of the Vandergriff Company.

Chief Justice Green, delivering the opinion for the

owner hires teamsters with wagons and teams to a third person for a stipulated price to do a particular work over the doing of which such person exercises general control; and he approved the holdings of the courts of New York and Massachusetts to the effect that the teamster was the servant of such third person in the doing of that work. He also cited and approved the holding in the Scribner case, supra, applying the common law principle above stated.

This principle has been applied in numerous decisions of our Supreme Court, some of which are: Powell v. Va. Const. Co., supra; Sanford v. Keef, 140 Tenn. 368, 204 S. W. 1154, Chamberlain v. Lee, 148 Tenn. 637, 257 S. W. 415; Wardrep v. Houston, supra; Shelton v. City of Greeneville, 169 Tenn. 366, 87 S. W. (2d) 1016; Owen v. St. Louis Spring Co., 175 Tenn. 543, 136 S. W. (2d) 498; Tenn. Coach Co. v. Reece, 178 Tenn. 126, 156 S. W. (2d) 404.

"'In determining whether in respect of a particular act a loaned servant is the servant of his original master or of the person to whom he has been furnished, the general test is whether the act is done in the business of which the person is in control as proprietor, so that he can at any time stop or continue it and determine the way in which it shall be done, not merely in reference to the result to be reached, but in reference to the method of reaching the result.' Sanford v. Keef, supra." Shelton v. City of Greeneville, supra, 169 Tenn. 368, 87 S. W. (2d) 1016.

Upon these authorities it is clear that the hauling in which Evans was engaged was the Company's business of which it was in control as proprietor, so that it could stop or continue the hauling at will and could and did

determine the way it should be done, not only as to the result but also as to the method of reaching the result. Therefore it is clear that in doing such hauling Evans was the Company's servant.

It is true that Wall was asked by the Trial Judge, "Under whose control was this truck while it was doing this work?" to which Wall answered, "Under mine." This was merely an opinion and legal conclusion of the witness and therefore not binding on the Trial Court or this Court. It was, moreover, contrary to the facts. The hauling was the Company's business and it controlled the truck and driver in doing that business. They could not have been under Wall's control because he was not on the job. He did not even know what the driver was hauling on the day of the accident.

It is said, however, that in no event could the Company be held for the driver's negligence in causing the accident, because Evans was not then on any business of the Company, but had finished his day's work and was on an errand for himself—on his way home to milk his cows.

As stated, Evans had delivered his last load at Smyrna for the day and was returning on the road back to the plant. True the plant had closed and he meant to go on by it to his home. But he was on his return journey between Smyrna and the plant when the accident happened. So it seems clear that he was acting in his master's business and within the scope of his employment.

Of course when the Company directed him to make the trip to Smyrna, it was contemplated that he would not only go but would return. The returning was as much a part of the trip as the going and this was true not only for the first trip but also for the last one.

"The test in brief is this: If the work of the employee creates a necessity for travel he is in the course of his

employment, though he is serving at the same time some purpose of his own.'' Cardozo, C. J., Marks' Dependents v. Gray, 251 N. Y. 90, 93, 167 N. E. 181, 183; Pratt v. Duck, 28 Tenn. App. 502, 512-513, 191 S. W. (2d) 562.

It is clear that the work created the necessity for the travel and that the servant was in the course of his employment though he was serving at the same time a purpose of his own—going home. I think this phase of the case is controlled by Jarratt v. Clinton, supra; Pratt v. Duck, supra; Ely v. Rice Bros., supra; Hall Grocery Co. v. Wall, 13 Tenn. App. 203.

For these reasons, I think the question whether Evans was a servant of the Company was a question for the jury, and that the judgments of dismissal as to the Company should be reversed and the cases remanded for a new trial as to it.

APPENDIX.

Ed Wall, one of the defendants, being called by the plaintiff, and having been first duly sworn, testified as follows:

DIRECT EXAMINATION.

''By Mr. Edwards:

''Q. Is this Ed Wall? A. That is right.

''Q. How old are you, Ed? A. I am twenty-nine.

''Q. Ed, who do you work for? A. Warren Brothers.

''Q. You mean Warren Brothers Roads Company? A. That is right.

''Q. How long have you been working for them? A. Well, two years.

''Q. About two years? A. That is right.

''Q. That would be, then, June, 1950. Then, of course, you were working for them in October, 1951? A. Yes, sir.

"Q. This truck that was registered in your name and was in the accident, how long had you had that, Ed? A. I guess I had had it around—

"Q. I mean before the accident? A. Two or three months.

"Q. Two or three months? A. Yes sir.

"Q. And you got it after you had asked an official of this Roads Company that if you got it you could haul for them, didn't you? A. No sir.

"Mr. Armistead: I object to that as a leading question.

"The Court: Yes, don't lead.

"By Mr. Edwards:

"Q. How did you happen to buy it?

"Mr. Armistead: I object to that as immaterial.

"Mr. Edwards: Now, if the Court please, I can't ask but one at a time.

"The Court: Wait one second.

"A. I have got—

"The Court: Wait a minute. The question is: Why did he buy it? What would be the materiality of that, Mr. Edwards?

"Mr. Edwards: Well, let me put it this way.

"The Court: He said it was registered in his name.

"By Mr. Edwards:

"Q. You bought it for the purpose of hauling for this Company, didn't you? A. No sir.

"Mr. Armistead: I object to that.

"The Court: Well, he says, 'No sir'.

"Mr. Armistead: I withdraw my objection.

"By Mr. Edwards:

"Q. From the time you bought it up to the time of this accident, did you haul materials for anybody else in it? A. Yes.

"Q. Who? A. I hauled for Neal Wyatt and I hauled some for myself.

"Q. The materials that you hauled for this Company were what? A. Well, some of it was rock, some sand. I didn't have any certain thing but whatever they needed.

"Q. You hauled asphalt too, didn't you? A. Some, yes sir.

"Q. You were hauling asphalt on the day that this happened, weren't you? A. Yes sir.

"Q. And the driver of the truck was Mr. Evans here, wasn't he? A. Yes sir.

"Q. Isn't it a fact that before this accident happened and at the time, under the agreement that you had with this Company, he would have to call an officer of the Company every morning to know what to do?

"Mr. Armistead: I object to that as a leading question.

"The Court: Yes. I sustain the objection.

"By Mr. Edwards:

"Q. He had to get directions as to where to haul and what to haul each day for them, didn't he?

"Mr. Armistead: I object to that as a leading question.

"The Court: Yes sir, don't lead.

"By Mr. Edwards:

"Q. Who did he get his directions from? A. From me.

"Q. From you? A. Yes sir.

"Q. You told him every morning where to go? A. I would call up on the phone most every night.

"Q. Where did you get the directions where he was to go? A. From some of the hands.

"By the court:

"Q. Some who? A. Some of his foremen asked could I let my truck haul places.

"By Mr. Edwards:

"Q. You mean the construction company, the Roads Company? A. (No response)

"By the Court:

"Q. The Warren Company? A. Yes sir.

"By Mr. Edwards:

"Q. Sir? A. Someone had to tell me where to haul to.

"Q. I know. You were just working for them, weren't you? A. Yes sir.

"Q. Now, under the agreement you had with them they could, the Roads Company could terminate it at any time, couldn't they? A. I didn't understand what you said.

"Q. You didn't understand it? A. No sir.

"Q. Under the agreement you had with the Roads Company about your truck hauling their asphalt or other things, they could terminate that at any time? A. Yes sir.

"Q. Now, when the driver took the asphalt or any other thing that he was hauling for the Roads Company, he took two slips, didn't he? A. I don't know.

"Q. You don't know? I thought you said you told him what to do? A. I didn't have to tell the man how many slips to send with him though.

"Q. Who made out those tickets? A. Someone at the Franklin-Limestone, I guess.

"Q. Sir? A. Wherever he was hauling—

"Q. They were not made out at the Warren Brothers Roads Company? A. If he was hauling from there it would be.

"Q. That is what I mean, and he was hauling from there on the day this accident happened, wasn't he? A. Yes sir.

"By the Court:

"Q. Hauling from whom? A. Hauling from down there on the Franklin Limestone Road.

"By Mr. Edwards:

"Q. Well, that is just the same as from Warren, is it not? A. Yes sir.

"Q. He was hauling asphalt that he got from Warren Brothers Construction Company, wasn't he, on this day? A. Yes sir.

"Q. And he had—

"The Court: Wait one second right there. What has the Franklin Limestone Company got to do with it? A. They just furnished them rock.

"Q. What? A. They just furnished them with stone to make this asphalt with.

"The Court: All right, go ahead.

"By Mr. Edwards:

"Q. Now, he took with him on this day a slip to be signed in duplicate and he would leave one with the man where he took it and give the other to you, didn't he? A. I didn't get any ticket.

"Q. How did you know what you were to collect from this Company then? A. Well, I don't have to keep up with it.

"Q. You don't? A. No sir.

"Q. Then the Company would keep up with it, is that right? A. I don't care about the ticket. I don't figure— He just took them down there. If he did, I didn't see them.

"Q. Well, isn't it the rule that he would have a ticket? A. Not necessarily. They did carry tickets.

"Q. And you were paid, of course, according to what was on that ticket, weren't you? A. Pay for what we hauled.

"Q. Well, that is not my question. You were paid according to that signed ticket where he hauled the asphalt, weren't you? A. If anyone ever signed a ticket on a job that he was hauling on, I have never seen it.

"Q. Those tickets were taken then back directly to the Warren Brothers Roads Company? A. I never asked where he carried them to.

"Q. Well, you know that, don't you? A. I don't know.

"Q. Sir? A. I don't know.

"Q. Do you know where he took the asphalt on this day?

"By the Court:

"Q. Do you know whether the truck on that day at the time of this accident was loaded with asphalt?

"Mr. Edwards: He said it was already.

"Mr. Armistead: No, no.

"By the Court:

"Q. Do you know that? A. No, I don't know. I didn't see the truck. There was no load on it.

"By Mr. Edwards:

"Q. The truck was kept, when this man, Mr. Evans, was driving it, he would keep it at his home at night, wouldn't he? A. Not all the time.

"Q. Well, I mean that was usually his custom? A. Well, if he had some work to do he carried it home.

"Q. Warren Brothers knew that, didn't they? A. No, I don't think they did. I wouldn't say they did.

"Q. You wouldn't say they didn't? A. I wouldn't say they knowed.

"Q. And you don't know where he delivered it on this day? A. No sir.

"Q. You haven't even heard since the thing happened, have you? A. I heard that he carried it to Smyrna. I dont know. I didn't go out there to see.

"Q. Then, as I understand you, you would communicate with the foreman or someone of the officials of the Roads Company at night and find out whether he was to haul the next day? A. Yes sir, whether they needed it or not.

"Q. Now, Mr. Wall, you are now stationed, have been transferred somewhere, haven't you? A. Yes sir.

"Q. Were you ever transferred away from here before this accident happened, during—while this hauling was going on?

"Mr. Armistead: I object to that on the ground that it is immaterial.

"The Court: Yes sir. What is the materiality of something that could have happened in his life as to transferring him to some other point?

"Mr. Edwards: Because if that was so, then this boy certainly then had to communicate with those people.

"The Court: Well, your question is, previous to this time, had he had been transferred somewhere else. I think that would be an immaterial matter.

"By Mr. Edwards:

"Q. Now, Ed, you have been instructed this morning when I came to talk to you about this thing by the attorney for this Company not to talk to me, have you not?

"Mr. Armistead: That is admitted.

"By Mr. Edwards:

"Q. In the presence of your lawyer at the time, Mr. T. O. Morris, you did talk to me several days ago, did you? A. Yes sir.

"Q. I will ask you if at that time you didn't tell me in the presence of Mr. T. O. Morris, your attorney then, that the officials of this Company had the direction of where this truck was to go, what it was to haul and controlled the whole thing and they could dismiss it at any time?

Didn't you tell me that over in Mr. T. O. Morris' office?
A. I didn't have no contract—

"The Court: Well, wait one second. He is putting to you a question now, if you didn't make that statement that he just called to your attention."

(Question read by the reporter)

"By Mr. Edwards:

"Q. Did you tell me over there that the Warren Brothers Company had control of this truck, what it was to haul, where it was to haul, you had to get your directions from them, and that if they did not like the driver for any reason they told you and you would have to fire him?

"Mr. Armistead: I object to that on behalf of Warren Brothers.

"The Court: On what ground?

"Mr. Armistead: Hearsay testimony.

"The Court: How is that?

"Mr. Armistead: Hearsay testimony, something he said over yonder to somebody else claiming to be—

"Mr. Edwards: He said it to me.

"Mr. Armistead: I am still objecting. I don't care who stated it.

"The Court: I sustain the objection.

"Mr. Edwards: Note an exception.

"Q. I understood you to say just a minute ago you didn't have any contract with Warren Brothers? A. I didn't.

"Q. Is that right? A. I didn't have any contract.

"Q. But this asphalt that was being hauled on this day was the asphalt of Warren Brothers, wasn't it? A. Yes sir.

"Q. And it was being hauled under their directions, wasn't it?

188

"Mr. Armistead: I object to that as a leading question.
"The Court: Yes sir, don't lead."

Cross Examination.

"By Mr. Armistead:

"Q. Mr. Wall, you were asked if I didn't in the presence of Mr. Edwards, instruct you not to talk to him, and you answered yes, at least, I admitted that is true. Were you not told that if you got on this witness stand to tell the truth, when you got on the witness stand? A. Yes sir.

"Q. Now, you stated there was no contract between Warren Brothers and you. Did you mean there wasn't any written contract? A. There wasn't any written contract.

"Q. There was nothing in writing about it? A. That is right; that is what I mean.

"Q. You didn't know from one day to the other whether or not Warren Brothers would want any hauling done in your truck, did you? A. I didn't know.

"Q. And you did haul for other people too, didn't you? A. Yes sir.

"Q. Now, wasn't their arrangement this—that Warren Brothers was short a truck and you had this truck and Warren Brothers would pay you so much for hauling, depending upon how many miles you went and what the tonnage was, is that right? A. That is right.

"Q. You hired Evans yourself? A. I did.

"Q. And Warren Brothers didn't have any right to fire Evans? A. No sir.

"Q. Warren Brothers didn't have any right to tell him whether to go slow or go fast, and the only thing he had to do was to deliver this, whatever he was hauling, ain't that right? A. That is right.

"Q. Now, you paid Evans yourself, didn't you? A. Yes sir.

"Q. If anything happened to that truck was Evans to call you or call Warren Brothers about getting it repaired or anything? A. Call me.

"Q. Who paid for the gasoline and oil and the upkeep on that truck? A. I did.

"Q. Did Warren Brothers tell you where to get gas and oil for that truck? A. No sir.

"Q. Sir? A. No sir.

"Q. Or tires for it. Did Warren Brothers have any right under your agreement with them to control Evans? A. No sir.

"Mr. Edwards: If your Honor please, that is a conclusion.

"The Court: I sustain the objection. He can state what their trade was.

"By Mr. Armistead:

"Q. Under your contract and agreement was it the agreement with Warren Brothers that Warren Brothers had the right to tell Evans where to take that truck when he got through the day's work? A. No, I wouldn't think so.

"The Court: Well, just state the facts.

"By Mr. Armistead:

"Q. Well did they or not? A. No sir.

"By the Court:

"Q. Under whose control was this truck while it was doing this work? A. Under mine.

"By Mr. Edwards:

"Q. The Court asked you under whose control this truck was on the day it was doing this work and I understood you to answer 'it was my truck'.

"Mr. Armistead: He said 'mine'.

"By the Court:

"Q. In the question here put to you, did you answer the question— A. That is right, my truck.

"Q. That was not the question that was put to you. The question that was put to you was not who owned the truck, you said it was your truck and registered in your name. The question put to you was whose control was it under? A. It was under my control.

"By Mr. Edwards:

"Q. You didn't even know it was hauling asphalt that day, you said a while ago.

"Mr. Armistead: He can't impeach his own witness.

"Mr. Edwards: If Your Honor please, I have got the right—

"The Court: Well, it is a well established rule you can't impeach your own witness.

"Mr. Edwards: I am trying to refresh his recollection.

"The Court: All right, go along.

"By Mr. Edwards:

"Q. You were told by a man from Warren Brothers the next day that you would have to get rid of this boy, weren't you?

"Mr. Armistead: I object to that as a leading question.

"The Court: Yes sir, ask him if he got any instructions from Warren Brothers about this boy.

"By Mr. Edwards:

"Q. Well, you got instructions from Warren Brothers?

"By the Court:

"Q. Did you get any instructions from Warren Brothers about this employee of yours the next day? A. No sir.

"By Mr. Edwards:

"Q. They never said anything to you about him?

"Mr. Armistead: I object to that.

"The Court: Yes. He said he got no instructions from them."

Cross Examination.

"By Mr. Davis:

"Q. Mr. Wall, how long did you say you had had this truck? A. I would say two or three months.

"Q. Do you know of your own knowledge whether or not this truck had a governor on it regulating and controlling its speed? A. Yes sir.

"Q. What was that maximum amount of speed set at? A. Well, it just had been set at forty-five, what I told the driver to have it set at.

"Q. Do you know of your own knowledge whether it had been in the Seventh Avenue Motors Garage down there about a day before this accident and the carburetor was checked? A. Yes sir.

"Q. Was that where the govenor is usually, on the carburetor? A. Yes sir.

"Q. Where were you when the accident happened? A. I was at the Air Base at Smyrna.

"Q. When was the first time you heard anything about the accident? A. That night after I came in from work.

"Q. You don't know anything at all about the facts of the accident? A. No sir.

"Q. Do you know the amount of the damage that was done to your truck, what part was damaged? Do you know the extent of the damage? A. Well, a small hole knocked in the radiator, that is all.

"Q. You didn't see the other truck that had the accident with your truck? A. No sir.

"By the Court:

"Q. On the day of this accident, had you communicated with the Warren people and gotten instructions from them to make certain deliveries that day? A. Do what now?

"Q. On the day that this accident happened, had you communicated with the Warren Brothers Company and had instructions from them for certain deliveries? A. I think I had that night, I am not sure, the night before.

"Q. Under your trade with them, you were to get so much for your deliveries based on the tonnage and the distance? A. That is right."

\* \* \* \* \* \*

Luther Joseph Evans, one of the defendants, being first duly sworn, testified as follows:

### Direct Examination.

"By Mr. Edwards:

"Q. You were driving this truck, weren't you? A. Yes sir.

"Q. What were you hauling in it, or had been hauling? A. Asphalt. I wasn't hauling anything at the time of the accident.

"Q. I know, but what had you been hauling? A. I had been hauling asphalt that day.

"Q. From the Roads Company out to where? A. To Smyrna.

"Q. And you were coming back and you had not yet—

"By the Court:

"Q. Were you returning from a delivery? A. That is right.

"By Mr. Edwards:

"Q. And you had been keeping the truck at home? A. Part of the time.

"Q. Hadn't you? A. Part of the time.

"Q. And when you were coming back from Smyrna you had not reached the point where you had gone off— you were still—you hadn't gotten back to the plant, Warren Brothers plant, had you? A. The plant was closed.

"Q. I didn't ask you that. You hadn't got back to Warren Brothers plant? A. I was not going back to the plant.

"Q. You hadn't gotten back on that road to the plant, had you? A. I was on the road that the plant is on, yes.

"Q. But you hadn't reached the plant? A. No sir."

\* \* \* \* \* \*

"By Mr. Armistead:

"Q. Mr. Evans, you delivered that last load for that day, didn't you? A. Yes sir.

"Q. And were on your way home to milk your cows, weren't you? A. Yes sir.

"Q. At the time of the crash was there stone or asphalt or anything at all on that truck? A. No sir.

"Q. As far as you know, Warren Brothers didn't know where the truck was kept? A. No sir.

"Q. You just worked for Mr. Wall then? A. That is right.

"Q. And he paid you, Wall paid you? A. Yes sir.

"Q. You were working by the day and you didn't have any particular jobs or anything like that? A. That is right.

"Q. When he would call you he would get you, and if he didn't he wouldn't get you, is that right? A. Yes sir.

"Q. About what time of the day did this happen? A. About a quarter after five.

194

"Q. Was that road that you were on and where this accident happened, was that on the direct line and way to your home with the exception of this turn-off? A. Yes sir.

"Q. And you were headed for home? A. Yes sir.

"Q. And had completed your delivery? A. That is right.