# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
February 11, 2002 Session

## JACK COLBOCH v. QUALITY FORD, INC., ET AL.

**Appeal from the Circuit Court for Hamblen County**
**No. 00-CV-045  Kindall T. Lawson, Judge**

**JULY 12, 2002**

**No. E-2001-01220-COA-R3-CV**

This appeal from the Circuit Court of Hamblen County questions whether the Trial Court erred in finding Quality Ford, Inc., an automobile dealership, liable for damages caused to Jack Colboch's automobile by an independent body shop pursuant to a manufacturer's warranty.  We affirm the decision of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**; **Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and CHARLES D. SUSANO, JR., JJ., joined.

Mark A. Cowan, Morristown, Tennessee, for the Appellant, Quality Ford, Inc.

Jana D. Terry, Morristown, Tennessee, for the Appellee, Jack Colboch.

### OPINION

In October, 1997, Mr. Colboch purchased a new Subaru Legacy from Quality Ford Subaru, Inc. (hereinafter referred to as "Quality Ford") in Dandridge.  In late December of that same year, Mr. Colboch was cleaning his automobile when he noticed irregular paint spots on the hood, roof and trunk lid.  After attempting unsuccessfully to remove the spots from the automobile himself, Mr. Colboch contacted the service representative at Quality Ford, Darlene Bridges.  Ms. Bridges informed Mr. Colboch that a factory representative[1] would have to examine the paint spots and give approval in order for the work to be completed under the factory warranty.  Following an examination of the automobile by a factory representative, Mr. Colboch was approved to have his Subaru Legacy repainted under warranty.

---

[1] Mr. Yaltz examined the automobile on behalf of Subaru of America.

Apparently, Quality Ford does not have a body shop and is not equipped to paint an automobile. Therefore, the decision was made that Roger Bunch Body Shop (hereinafter referred to as "Body Shop") would paint the automobile. The parties disagree as to who actually made that determination. Mr. Colboch testified that he gave the automobile to Mr. Bunch and that Mr. Bunch drove the automobile to his body shop. When the automobile was finished, thirteen days later, Mr. Colboch retrieved the automobile. Mr. Colboch immediately noticed that the automobile had been painted the wrong color and he notified Quality Ford of the mistake. Mr. Colboch testified that Ms. Bridges and her husband took the automobile from Mr. Colboch's house to the Body Shop, and had it repainted a second time. The automobile was returned to Mr. Colboch by Quality Ford approximately thirteen days later. Mr. Colboch testified that the automobile was returned with the paint full of dirt and pin holes.

Upon contacting Quality Ford again, Mr. Colboch's automobile was painted a third time by the Body Shop. This time the automobile was returned after approximately thirteen days and all the windows in the automobile were scratched, the automobile still had not been painted correctly, and the automobile was filthy and covered in rubbing compound. At this point Mr. Colboch approached Allen Drinnon, the owner of Quality Ford. According to Mr. Colboch's testimony, Mr. Drinnon instructed Ms. Bridges to take care of Mr. Colboch's automobile.

The fourth time the automobile needed to be painted, it was again taken to the Body Shop by Ms. Bridges and her husband. According to Mr. Colboch's testimony, he attempted to contact Ms. Bridges on several occasions to find out where they had taken his automobile but was unsuccessful in his attempts. Finally, sixty-five days later, Mr. Colboch went to Mr. Bunch's home and found his automobile sitting in the driveway with the keys in the ignition. Mr. Colboch drove his automobile home. Mr. Colboch testified that the condition of his automobile was far worse inside and outside than it had been prior to its fourth trip to the Body Shop. Additionally, Mr. Colboch found a handwritten note from Ms. Bridges to Mr. Bunch in his automobile which stated:

> Roger, Please re-paint this stupid automobile from the pin stripe up
> all the way around. Take your time 2 weeks would be good. If you
> need anything call me at work 1-800-287-1281 or David at home. I
> really appreciate your help, I owe you one. Darlene

After retrieving his automobile, Mr. Colboch filed a Civil Warrant in the General Sessions Court of Hamblen County wherein he received a judgment in the amount of $4,761.10 against Quality Ford. Quality Ford appealed the judgment of the General Sessions Court to Circuit Court. Following a hearing in Circuit Court on February 9, 2001, the Trial Court awarded Mr. Colboch $4,700.00 for costs to repair his automobile and $2,100.00 for loss of use of his automobile, for a total of $6,800.00.

Quality Ford appeals the decision of the Trial Court and presents for our review one issue which we restate: whether the Trial Court erred in finding Quality Ford liable for damage to Mr. Colboch's automobile caused by Roger Bunch Body Shop.

Mr. Colboch also raises one issue for our review which we restate: whether the Trial Court erred in awarding damages based upon the estimated cost of repair of the automobile plus loss of use of the automobile during the four attempts to repaint the car rather than awarding damages based upon diminution in value of the automobile or in the alternative an additional award of damages for loss of use of his automobile during the time it would take to repair the automobile.

As mandated by Rule 13(d) of the Tennessee Rules of Appellate Procedure, our standard of review in this non-jury case is *de novo* upon the Trial Court record with a presumption of correctness as to findings of fact by the Trial Court. There is no such presumption as to findings of law. *Campbell v. Florida Steel Corporation*, 919 S.W.2d 26 (Tenn. 1996).

Quality Ford argues that the Trial Court improperly held it liable for damages caused by an independent third party under a manufacturer's warranty. Quality Ford asserts that the Trial Court based its decison on the law of agency, rather than determining that the Body Shop was an independent contractor. Quality Ford further contends that the facts in this case support its argument that Quality Ford simply made a referral to the Body Shop.

Quality Ford relies on *Youngblood v. Wall*, 815 S.W.2d 512 (Tenn. Ct. App. 1991) in asserting that the Body Shop is an independent contractor. Quality Ford further argues that it had no right of control over the conduct of the work performed by the Body Shop and therefore no agency relationship existed.

Mr. Colboch argues that based upon an opinion issued by this Court, *Sain v. Ara Manufacturing Co.*, 660 S.W.2d 499 (Tenn. Ct. App. 1983), Quality Ford is liable and that the key factor in making that determination is the right to control the conduct of the agent with respect to those matters entrusted to the agent and that Quality Ford had that control over the Body Shop.

We agree with Mr. Colboch. In its Memorandum Opinion, the Trial Court stated:

> The real damage today seems to come from the repair. It was damaged more in the process of this repair than that there was in the first place before they ever started attempting to repair it.
> I think the dealer becomes liable when they choose and essentially recommend or refer the customer to a person.
> The testimony is that this person that they referred to is not certified or qualified by anybody; that they really hadn't apparently done very much, if any, business with him before and knew apparently very little about him except maybe he worked at a Ford dealer somewhere before.
> I think they do become liable when they begin to take those steps and continue to do that and so I think liability does run to the dealership.

In determining whether the relationship is one of principal and agent, or independent contractor, the following factors must be considered: (1) the right to control the manner and conduct of the work; (2) the right of termination; (3) the method of payment; (4) the freedom to select and hire helpers; (5) the furnishing of tools or equipment; (6) self scheduling of working hours; and (7) the freedom to render services to others. *Masiers v. Arrow Transfer & Storage Co.*, 639 S.W.2d 654, 656 (Tenn. 1982). The primary test of agency is the right to control the conduct of the agent with respect to matters entrusted to the agent. *Sain v. Ara Manufacturing Co.*, 660 S.W.2d 499 (Tenn. Ct. App. 1983). The Sixth Circuit addresses this issue in *Doane Agricultural Service v. Coleman*, 254 F.2d 40, 43 (1958), which this Court cited in *Sain*:

> The Tennessee cases have defined "agency" in its broadest sense to include "every relation in which one person acts for or represents another." *Howard v. Haven*, 198 Tenn. 572, 281 S.W.2d 480, 485; *Gulf Refining Company v. Huffman & Weakley*, 155 Tenn. 580, 297 S.W. 199. The cases largely determine that an employee status is determined by whether the alleged employer has the right of control over the method as distinguished from the results and look to such things as the right to hire and fire, to direct the manner and method of the work, as to who paid the wages, whether the pay was based upon time or by the job, whether the work was ordinary labor, or skilled labor, and who provided the tools for the work. *Rose & Co. v. Snyder*, 185 Tenn. 499, 514, 206 S.W.2d 897; *Mayberry v. Bon Air Chemical Company*, 160 Tenn. 459, 26 S.W.2d 148. See *Conasauga River Lumber Company v. Wade*, 6 Cir., 221 F.2d 312.

As in *Sain*, not all the criteria mentioned in *Doane Agricultural Service* have been met in the case *sub judice*; however, we are persuaded by the facts in the record that Quality Ford exercised sufficient control over the Body Shop in the many failed attempts to repair the paint on Mr. Colboch's automobile to be held liable for the damages resulting therein.

In support of our decision, there are numerous examples to point out the amount and level of control Quality Ford had with respect to the Body Shop painting this automobile. Ms. Bridges, an employee of Quality Ford who holds the title of Subaru Warranty Administrator, testified on cross-examination:

> Q . . . Ms. Bridges, you basically were approached by Mr. Colboch and asked to refer him to someone to paint the car, is that correct?
>
> A Not really. The way it worked, I was not the Service Manager at the time Mr. Colboch came to the dealership. We had had a new employee and since I had dealt with Subaru of America for so long I was brought into it. I was not aware that there was actually a problem till the day that Mr. Yaltz

-4-

was there to look at the vehicle and because I am the Warranty Administrator he brought me out there and said, yes we will paint the car, you need to, you know, look up the operations and the labor amount and find someone that will do it for that dollar amount.

Q    Okay.  And that would be Roger Bunch?

A    That's who we decided to do the work, yes.

. . .

Q    Now, you don't deny that each subsequent time from the first time that you actually went out physically and got Mr. Colboch's car and took it to Mr. Bunch's Body Shop, you don't deny that?

A    No, ma'am, I do not.

. . .

Q    I'm going to ask you what's been marked as Exhibit #4 and can you identify that as your handwriting?[2]

A    Yes, that's my handwriting.

Q    And that was instructions to Mr. Bunch to repaint this car, is that right?

A    Yes.

It was undisputed that on more than one occasion Quality Ford's employee delivered Mr. Colboch's automobile to the Body Shop and then returned the automobile to Mr. Colboch following completion of the work.  It was further undisputed that Quality Ford was paid by Subaru of America, Inc. for the repairs and they, in turn, paid the Body Shop following the first attempt to repaint the automobile thereby controlling the method of payment.  The Body Shop did not receive payment from Quality Ford, Mr. Colboch, or Subaru of America, Inc. for the three remaining attempts to correctly paint the automobile.  It is evident from the record that Quality Ford was the entity directing the Body Shop as to what to do to the automobile, the appropriate amount of time to spend on the automobile, and how much, if anything, he would be paid, thereby controlling the manner and conduct of the work.

Mr. Colboch questions whether the Trial Court erred in awarding damages based upon the estimated cost of repair of the automobile plus loss of use of the automobile during the four attempts to repaint the car rather than awarding damages based upon diminution in value of the automobile or in the alternative an additional award of damages for loss of use of his automobile during the time it would take to repair the automobile.  As for Mr. Colboch's argument that the Trial Court should have awarded him the diminution in value of his automobile rather than the estimated cost of repair, we disagree.

---

[2] Exhibit #4 is the aforementioned letter from Ms. Bridges to Mr. Bunch regarding the painting of the automobile found by Mr. Colboch upon retrieving his car from Mr. Bunch's house the final time.

Mr. Colboch relies on *Yazoo & M.V.R. Co. v. Williams*, 185 S.W.2d 527 (Tenn. 1945), in arguing that because his automobile cannot be restored to substantially the same value prior to the damage, he is entitled to the difference in the fair market value of the automobile immediately before and immediately after the incident. Mr. Colboch further argues that the value of his car prior to the damage was $18,000.00, which is the price he paid for his automobile, and that testimony by his expert witness, Mr. Widener, valued his car at $9250.00 following the damage, and therefore, he is entitled to $8750.00. The record fails to support this argument.

Kenny Widener, an automobile appraiser and Mr. Colboch's expert witness, testified on direct examination to the following with respect to the damages:

Q Have you prepared an opinion or do you have an opinion as to the value of Mr. Colboch's car and the damages that were incurred?

A Yes, I do.

Q Can you tell the Court your opinion?

A Well, my opinion, the car was worth about Twelve Thousand Seven Hundred Dollars and then due to the work that had been done to it and the diminishing of it, it would diminish it about Four Thousand Dollars.

Q Okay. How did you reach that conclusion?

A Well, the condition of the car, looking at it and knowing the values of cars and how much they take away if the car has had any damage done to it, you know, and just doing it that way.

Q Okay. In looking at Mr. Colboch's car what types of damage did you see?

A Well, I found that the paint, the car had been repainted and it had been a very poor quality of a job, the sanding and the buffing of it. None of the moldings that I could tell had been taken off; they had been painted and they had paint on them. Where they had tried to sand the car they had hit the windows with the DA sander it looked like, and scratched the windows, stuff like that.

Q Okay. Now, you didn't acutally do an appraisal to tell how much the car would cost to be repaired?

A No.

Q You did an appraisal of diminution value?

A Just the diminished, yes, the diminution value.

Q And let me ask you. If Mr. Colboch's car were repaired could it be restored to the same value as another car?

A I don't think so.

On cross examination, Mr. Widener was asked again if he had testified that the diminution value of the car was "somewhere between Three Thousand Five Hundred to Four Thousand Dollars" and Mr. Widener responded, "Un-huh."

We find no support in the record for Mr. Colboch's argument that the diminution value of the Subaru Legacy was $8750.00. Therefore, we find that this argument is without merit.

Lastly, Mr. Colboch argues that he is entitled to the value of the loss of use of his automobile during the period of time it would take to repair it. Mr. Morrison testified that it would take between three and four weeks to repair the car. Mr. Widener testified that a rental car would cost $15 to $20 per day. In relying upon *Yazoo & M.V.R. Co. v. Williams*, 185 S.W.2d 527 (Tenn. 1945), Mr. Colboch's reasoning is flawed as he has asserted and the record reflects that his automobile is not capable of being restored to a value substantially the same as its value prior to the damage caused by the four attempts to paint the automobile. *Yazoo* sets forth that one is entitled to the value of loss of use when the property can be restored to its original value following repair. According to the evidence in the case *sub judice,* that is not the case. We, therefore, find this argument is without merit.

The judgment of the Trial Court is accordingly affirmed and the cause remanded for collection of the judgment and costs below. Costs of appeal as well as costs below are adjudged against the Appellant, Quality Ford, Inc., and its surety.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE