MACK SCOTT, JR., et al., Plaintiffs in Error, v. HAR-
RY T. ATKINS et al., Defendants in Error.—314 S. W.
(2d) 52.

Western Section. March 12, 1957.

Certiorari denied by Supreme Court July 29, 1957.

Franklin W. Latta, Dyersburg, for plaintiffs in error.

Jones Greer, Dyersburg, for defendants in error.

AVERY, P. J. (W. S.) This is a contest in a proceeding devisavit vel non of the will of Louise Brackin Atkins, who is the same person as Mrs. John A. Atkins, she being referred to by that name in the record and in the exhibits filed with the record. The script is a holograph written upon each side of three sheets of paper. It is dated Saturday, August 12, 1950, this date appearing at the top of the first sheet and first page of the script, and also appearing in two separate and distinct places, one of which is at the extreme bottom of the last page of the will and one appearing a few lines above this last date, both of which immediately precede the name "Louise Brackin Atkins". The obvious reason for both dates near the end of the script being that after she had dated and signed the holograph she decided to give her colored cook the house and lot which she did by a sentence below where she had first dated and signed the script, after which sentence she again signed her name and dated the script.

She died about May 4, 1951, leaving her husband, John A. Atkins, whom she named executor in her will, and with a number of cousins on both paternal and maternal sides as her nearest relatives. There was only one child born to said testatrix and/or her said husband, a daughter who died at the age of four years, long before her mother or her said father.

The will was probated on June 19, 1951, in the Common Law and Chancery Court of Dyer County which is a special court created by Chapter 57, Senate Bill 539, Public Acts of 1947, and which Court is designated as the court wherein wills should be probated and proven in common form in Dyer County.

The surviving husband, John A. Atkins, took over her entire estate which consisted of vast holdings, of real estate and personal property, some of which Mrs. Atkins had inherited from her deceased mother, Mrs. Georgia Brackin and her deceased brother, Albert Brackin.

It appears from the record that the executor who was appointed without bond, administered the affairs of the estate in a legal way and made settlements thereof and was discharged as such in April of 1952. (R. 48.) He died in 1954.

The heirs of Louise Brackin Atkins, the heirs of John A. Atkins, and his personal representatives are all before the Court of contest. Within a few days after the death of Louise Brackin Atkins, Robert D. Jones, Judge of the Common Law and Chancery Court aforesaid, Jesse Bradshaw, Verna Mae Haggard, H. B. Watkins and John A. Atkins, together with R. E. Rice opened a lock box containing the valuables listed on page 29 of the transcript. This took place in the office of R. E. Rice.

The original contesting petition was filed in said Common Law Court of Dyer County by several of the relatives of the alleged testatrix, charging that the probated script was not the will of Louise Brackin Atkins, because: (1) it was never completed; (2) it was never intended by Louise Brackin Atkins to be her last will but merely a script or memorandum; (3) was not found among her

valuable papers nor in her lock box; (4) it was not put in the hands of any person for safekeeping. The petition concluded with the usual prayer that the paper writing be certified to the Circuit Court of Dyer County that its validity might be tried. The petition was answered, the pertinent parts of which were simply a statement denying that the script probated in said Common Law Court was not the will of Louise Brackin Atkins, asserting that it was a will and was her last will and so intended to be, and was complete in every respect and manner. It also denies the statements that the will was not found among the valuable papers of the testatrix, was not kept with valuable papers, and was not lodged with some responsible person for safekeeping.

Bond was properly executed and the proper order made by the Judge of said Common Law Court, directing the Clerk to certify the complete transcript of the record in said proceedings from that Court to the Circuit Court of Dyer County, all of which was done. After the papers were certified to the Circuit Court, the deposition of R. E. Rice, the attorney who represented the executor and who was present when the lock box was opened in his office, in the presence of several persons including the employees of the bank where Mrs. Atkins did business, her husband and others, was taken and it developed that along with the papers brought to his office, which included the inventory of the box, so far as personal property is concerned, signed by all persons present, there was another paper which purported to be a memorandum of the description of real estate owned by the testatrix.

Pursuant to that information, when the case was called for trial in the Circut Court, the contestants, over the

objection of the proponents, were permitted to file an amendment to the original petition in which they asserted:

"that there were other writings testamentary attached to said script disposing of the real estate belonging to Louïse Brackin Atkins, that they were attached to and made a part of said script. That said John A. Atkins concealed, suppressed, and withheld said writings from the Probate Court, and only presented such parts of said script as were beneficial to him, the said John A. Atkins. That said John A. Atkins and his attorney had no right to pass upon the legality of said scripts or writing, and were compelled by statute to present them for probate. And by concealing and suppressing them they have violated their obligations to the legatees and devisees of said estate and denied them their legal rights. That all papers attached to said script should be presented to this court so that the jury herein can properly pass upon the issues to be presented to them." (R. 5.)

Following the presentation of that amendment, there was considerable colloquy between the Court and counsel with respect to whether or not the Court had jurisdiction to try the contest as made by the proferred amendment. This discussion between the Court and counsel is set out in the transcript and covers eight typewritten pages. (R. 8-15.) The substance of this discussion between the Court and counsel for all parties shows that all the parties agreed for the Circuit Judge and the jury to hear the contest upon three issues to be submitted to the jury. Apparently, with this agreement

the Court correctly tried the case, submitted the issues to the jury, and upon the verdict of the jury propounded and probated the will in common form, certifying the proper order to the Common Law Court of Dyer County.

Exceptions and objections were properly made to all the proceedings and motion for a new trial filed and overruled. Appeal was prayed, granted and perfected to this Court, where errors have been assigned.

The applicable statute is the "Uniform Wills Act of 1941." That part of the Act relating to the manner and method of proving holographic wills is now Section 32-105, T. C. A., as follows:

"No witness to a holographic will is necessary, but the signature and all its material provisions must be in the handwriting of the testator and his handwriting must be proved by two (2) witnesses."

▆▆▆ Prior to the passage of that Act, the holograph did not only have to be, each and every part of it, in the handwriting of the testator, but it had to be found among the valuable papers of the testator after his death or put in the hands of some responsible person for safekeeping. The handwriting had to be proven to be that of the alleged testator by at least three credible witnesses who are acquainted with the handwriting of the alleged testator and the proof had to show that the handwriting was generally known by the acquaintances of the said alleged testator. For practical purposes that is still the law with respect to holographic wills executed prior to February 15, 1941, T. C. A. sec. 32-110. Of course all circumstances necessary to show the familiarity of the witnesses with the handwriting of the alleged testator are competent. If the witnesses are familiar

with the signature and handwriting of the testator by experience, and they are credible witnesses and can testify that the script is each and every part in the handwriting of testator, that is sufficient. If the circumstances of their familiarity with the handwriting of the testator is partly by experience and partly by comparison with the signatures that they know to be the genuine signature of the alleged testator, and if credible, they would be competent witnesses. So it is a matter for the Trial Court to determine whether the proof offered by any particular witness qualifies him to give testimony which is necessary under the statute respecting a holographic will and its execution. Sizer's Pritchard on the Law of Wills and Administration, Sec. 232; Crutcher v. Crutcher, 30 Tenn. 377, 385; Marr v. Marr, 39 Tenn. 303; Hooper v. McQuary, 45 Tenn. 129; McCutchen v. Ochmig, 60 Tenn. 390; Douglass v. Harkrender, 62 Tenn. 114; Reagan v. Stanley, 79 Tenn. 316; Pulley v. Cartwright, 23 Tenn. App. 690, 137 S. W. (2d) 336.

If the testimony with respect to the animus testandi be doubtful, all the facts and circumstances may be looked to, and it is for the jury to determine from all the evidence, intrinsic or extrinsic, whether or not the testator intended the instrument to operate as his will. The statutory requirements must be accompanied by sufficient proof of intent which must be proven in a manner which conforms to applicable rules of evidence and procedure; otherwise the script cannot be accepted as a will. Marr v. Marr, supra; Hooper v. McQuary, supra; McCutchen v. Ochmig, supra; Douglass v. Harkrender, supra; Smith v. Smith, 1949, 33 Tenn. App. 507, 232 S. W. (2d) 338; Davidson v. Gilreath, 38 Tenn. App. 291, 292, 273 S. W. (2d) 717.

■ The fact that a script is in the form of a will, perfect in all of its parts, written and signed in full compliance with statutory requirements, does not raise a conclusive presumption in favor of the propounded instrument. It may not operate as a will if shown by proof not to have been so intended. Mere notes or memorandum for a will, though drawn in the form and manner of a will, but not animo testandi, cannot operate as such, even though there was a compliance with all the statutory formalities. Eatherly v. Eatherly, 341 Tenn. 461, 462, 78 Am. Dec. 499; Guthrie v. Owen, 21 Tenn. 202, 36 Am. Dec. 311; Crutcher v. Crutcher, supra; Smith v. Smith, supra; Davidson v. Gilreath, supra.

In the instant case in the general charge, the Court made the following statement to the jury:

"To prove the formal execution of the paper writing, purporting to be the last will and testament of the deceased, Louise Brackin Atkins, and establish its formal execution, it will be necessary for you to determine these three questions:

"(1) Were the signature and all the material provisions of the paper writing in the handwriting of Louise Brackin Atkins?

"(2) Did at least two, credible witnesses, prove the fact that the signature to the paper writing and all the material provisions thereof were in the handwriting of Louise Brackin Atkins?

"(3) Did Mrs. Louise Brackin Atkins intend for this paper writing to be her will?" (R. 88.)

The Court also stated to the jury that:

"At the request of contestants the court submits the following questions to you.

"(1) Were there other paper writings pertaining to the will of Louise Brackin Atkins?

"(2) Were those other papers ever presented to the proper Judge or Court for probate and filed along with the script?

"(3) Is the script propounded to the jury the full, complete, whole and last will of Louise Brackin Atkins?" (R. 86.)

The Court then said:

"After considering all the facts and circumstances in the case and the rules of law then write your verdict as you find for or against the will." (R. 86, 87.)

The jury began consideration of the case, and later returned to the court room, where Foreman Yates said to the Court:

"Foreman Yates: Judge, we have a question, we have reached a verdict, but do we have to answer the three questions with either a 'yes' or 'no'?

"The Court: The way you think the facts justify you to answer them.

"Foreman Yates: If we have to answer them we will have to retire again.

"The Court: Answer them any way you think they should be answered."

The jury then left the court room and later returned when the following took place:

"The Court: Gentlemen, have you reached a verdict?

"Foreman Yates: Yes, sir, shall I read it?

"The Court: Go ahead.

"Foreman Yates: (1) Yes, but we do not find these papers pertain in any way to the disposition of her property. (2) Yes, we find these papers were presented to the Court but not filed with the script. (3) Yes.

"The Court: Then you the jury find in favor of the will?

"Foreman Yates: Yes sir.

"The Court: So say you all?

"Jurors (in unison): Yes, sir." (R. 87.)

The first Assignment of Error is that the Court erred in overruling the motion made by the contestants at the conclusion of all the evidence for a directed verdict in favor of contestants, which motion for its support rests upon the theory that there was no material evidence introduced upon which the contestants had a right to go to the jury for a verdict.

Assignment of Error II is simply that the Court erred in failing to sustain contestants' motion for a new trial.

Assignment of Error III assigns error in the Court submitting the question of whether the signature and all

provisions of the will were in the handwriting of the testatrix, upon the theory that no competent evidence has been introduced by at least two witnesses that all the material provisions, including the signature to the alleged will, were in the handwriting of the testatrix, Louise Brackin Atkins. It also attacks the qualifications of the witnesses who testified in response to the handwriting and signature of the testatrix.

■ Assignment of Error IV avers that it was error for the Trial Judge to enter the decree in favor of the will, (Tr. 96, 97) in view of the finding of the jury that there were other pages pertaining to the property of Louise Brackin Atkins and *"made a part of her will but not probated"* either in Common Law or in Chancery Court of Dyer County, nor in the Circuit Court of Dyer County, when the script was probated in solemn form.

A careful examination of the verdict of the jury reveals the fact that the jury did not find that there were other papers or pages pertaining to the property of Louise Brackin Atkins "and made a part of her will but not probated", etc. We think the jury expressly found upon the issues submitted by contestants that there were other pages pertaining to the property of Louise Brackin Atkins found with the will, but the jurors said:

"We do not find that these papers pertain in any way to the disposition of her property."

In this Opinion reference to the verdict of the jury has heretofore been made and will hereafter be made, but insofar as this Assignment of Error IV is concerned, it is overruled without further reference to it by specific number.

■ Assignment of Error V is levelled at the refusal of the Trial Court to grant the motion for a new trial because the jury answered question No. 2, which was propounded at the special request of the contestants, "Yes, we find these papers were presented to the Court but not filed with the script." Contestants say that all the proof in the record shows that none of these papers were ever presented to any court, and especially the Circuit Court in which the will is being contested.

In the first place, it was not a question for the jury to decide whether the papers had been presented to the proper Judge or Court for probate. That is a legal question which the law itself decides and certainly it is admitted by contestants that the alleged probate took place before the "proper Judge or Court" which had jurisdiction of such matters. Even if the jury had no right to so find, the fact that in answering the question propounded they did find as stated, and there was no evidence to support it, could not affect the validity of that which they did find to be the whole will of the testatrix. Therefore, Assignment of Error V will be overruled without further special comment on it by specific number.

Assignment of Error VI is levelled at the refusal of the Court to grant the motion made at the conclusion of all the evidence for a directed verdict for contestants, that the jury be required to answer question No. 1 "yes"; question No. 2 "no"; and question No. 3 "no", and because there is no competent evidence proving the legal execution of the script as the holographic will of the testatrix. This Assignment will be considered along with Assignments I, II, and III.

Assignment of Error VII is essentially the same as Assignment IV, and while the general matter embraced therein will be discussed in this Opinion, this Assignment VII must be overruled as was Assignment IV, and it will not be referred to by specific number hereafter in this Opinion.

Assignment of Error VIII and parts of other Assignments are levelled at the action of the Court in entering a judgment upon the verdict of the jury, which alleged error is predicated upon the assertion that the verdict resulted from favoritism, passion, prejudice and unaccountable caprice, or the personal feelings of the jurors.

We think nothing in the record indicates that there was any misconduct on the part of the jury of any character, nor do we find that any part of their verdict so indicates. Therefore, Assignment of Error VIII is overruled and no reference will be made to it hereafter in this Opinion by specific number.

Assignment of Error IX is levelled at the action of the Court upon the theory that the verdict rendered by the jury, other than the specific answers to the questions propounded, was not a jury verdict but was "extracted from the jury by the Judge". The whole of this Assignment is based upon the theory that after the jury had reported its answers to the three questions submitted, the Court then said:

"The Court: Then you the jury find in favor of the will?

"The Foreman: Yes, sir.

"The Court: So say you all?

"Jurors (in unison): Yes, sir."

That is the only conclusion that could be reached from the jury's answer to question No. 3 which was a question propounded strictly at the request of the contestants, and repeating now that question for emphasis:

"Is the script propounded to the jury the full, complete, whole and last will of Louise Brackin Atkins?"

And the jury answered "Yes". The contestants having insisted upon submitting such question, and the Court having granted contestants' request, and the jury having so answered, the answer is tantamount, even without further inquiry from the Court to the jury as saying: "We find the script propounded to the jury to be the full, complete, whole and last will of Louise Brackin Atkins." Therefore, this Assignment IX will be overruled without further comment on it by specific number.

Assignment of Error X is overruled. It simply states that the Court was in error in overruling the 12th ground of defendants' motion for a new trial, without any statement of why such action constituted error on the part of the Trial Court. It does not comply with sub-section (2) of Rule 11 of this Court which provides that the errors must, in order to reverse or modify the action of the Trial Court, show "specifically wherein the action complained of is erroneous, and how it prejudiced the rights of the appellant, or plaintiff in error", etc., and is therefore overruled.

Assignment of Error XI is levelled at the action of the Court in refusing to instruct the jury, contestants' fourth special request, as follows:

"Generally speaking, it is the validity of a will as a whole, and not the validity of particular bequests contained in the will, which is involved in a proceeding to probate, and a court is without power to reject a portion of a propounded instrument, or will, but all of said instrument or will must be presented to the jury, and you have the right to say whether the executor has presented the whole, complete and last will of Louise Brackin Atkins to the court for probate. And if you find that the Executor failed to present for probate the whole, complete, and last will of Louise Brackin Atkins, but probated only a part thereof, it is your duty as jurors to find such facts, and find against the will." (R. 104.)

Assignment of Error XII is another assignment levelled at the action of the Trial Court in refusing to direct a verdict for contestants at the conclusion of all the proof. It will be considered along with Assignments I, II, III and VI. It generally avers that the jury accepted as its verdict an opinion expressed by Judge Robert D. Jones to the effect that the referred to "other papers" were not a part of the will.

Assignments of Error XIII and XIV are leveled at the action of the Trial Judge in overruling contestants' motion for a directed verdict based upon the maxim that "No one shall be permitted to profit by his own fraud or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." Evidently these two assignments have no place in this contest, as will be seen from the general statements in this Opinion in regard to other assignments of error herein not specifically overruled. There-

fore, both Assignments XIII and XIV are overruled without further reference to them by specific numbers.

■ In a will contest the Circuit Court has exclusive and original jurisdiction to hear the contest and thus it becomes, in effect, the Court to determine the validity of the will and the trier of every issue made by the contesting parties and the proponents of the will necessary for its probate. T. C. A. secs. 32-401, 16-503; Murrell v. Rich, 131 Tenn. 378, 175 S. W. 420.

■ All proceedings with respect to the probate of a will when contested are transferred immediately to the Circuit Court of the county wherein the legal probate of the will could be had. Thus, the probate proceedings are in effect transferred to said Circuit Court, not as a matter of appeal but because of its original jurisdiction of will contests. Phillips' Pritchard on Wills, paragraph 337; Murrell v. Rich, supra; Lillard v. Tolliver, 154 Tenn. 304, 311, 312, 285 S. W. 576; 57 Am. Jur., Sec. 762, p. 521.

In the Circuit Court the issues of fact in a will contest shall be tried to a jury. T. C. A. sec. 32-408.

■ In passing upon motions for a directed verdict, the Trial Court must look to all the evidence, construe it most favorably in behalf of the party against whom the motion is made, taking as true that which supports his rights, and allow all reasonable inferences from the evidence in his favor, discarding all countervailing evidence. This rule applies in will contests the same as all other cases where the facts are triable by a jury. Jones v. Sands, 41 Tenn. App. 1, 292 S. W. (2d) 492, 497; Davidson v. Gilreath, supra; Hammond v. Union Planters Nat.

Bank, 189 Tenn. 93, 222 S. W. (2d) 377; Pierce v. Pierce, 174 Tenn. 508, 127 S. W. (2d) 791; McBee v. Bowman, 89 Tenn. 132, 14 S. W. 481; Pettitt's Ex'rs v. Pettitt, 23 Tenn. 191.

In Cude v. Culberson, 30 Tenn. App. 628, 209 S. W. (2d) 506, 511, the rule is stated by the late lamented Judge Anderson of this Court, and approved in the case of Jones v. Sands, supra, as follows:

"This rule is that there can be no exercise of the power to direct a verdict in any case where there is a dispute as to any material evidence, or any legal doubt as to the conclusion to be drawn from the whole evidence, upon the issue to be tried."

Commenting upon this rule in the case of Jones v. Sands, supra, we said [292 S. W. (2d) 498]:

"From the whole of the relevant, material and substantial evidence introduced by the party against whom the motion is made together with all other evidence in the case materially supporting the position of such party and all legitimate inferences of fact favorable to him which may be legally drawn from such evidence, disregarding all other countervailing evidence, can the party against whom the motion is made succeed, under the proper charge of the court, is the correct position of a trial judge in considering a motion for a directed verdict. Tyrus v. Kansas City, Ft. S. & M. R. Co., 114 Tenn. 579, 86 S. W. 1074; Smith v. Sloan, 189 Tenn. 368, 376-377, 225 S. W. (2d) 539, 227 S. W. (2d) 2; McMahan v. Tucker, 31 Tenn. App. 429, 216 S. W. (2d) 356, 360; Tennessee Cent. Ry. Co. v. McCowan, 28

Tenn. App. 225, 188 S. W. (2d) 931; Prudential Ins. Co. of America v. Davis, 18 Tenn. App. 413, 429, 78 S. W. (2d) 358, 368; Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn. 551, 249 S. W. 984, 985; Cude v. Culberson, supra; Hammond v. Union Planters Nat. Bank, supra; Chapman v. Evans, 37 Tenn. App. 166, 261 S. W. (2d) 132, 135.''

 Material and substantial evidence is that which is material to the particular question in controversy upon the issues joined and which must necessarily enter into consideration of the controversy, and which also by itself or in connection with other testimony will be determinative of the case. Jones v. Sands, supra; See Words & Phrases for other constructions and definitions of ''Substantial Evidence.''

 In the trial of a will contest to a jury, the verdict may be in favor of or against the validity of the will as a whole or it may find the whole good in part and bad in part. In the ordinary will contest the validity of the entire will is involved and the verdict is a general one, either for the proponents or for the contestants (for plaintiff or defendant). The jury may find a special verdict setting forth how they find the facts and leaving the Court to pronounce the proper judgment on the facts as found. If in a special verdict, all the facts upon which the validity of the will depends are found by the jury, it will amount to a general verdict. Special verdicts are desirable only in exceptional cases. Phillips' Pritchard on Wills, Vol. 1, Sec. 376.

In the instant case, the verdict of the jury must be considered both general and special, since the Court submitted the general and special issues to the jury to be

answered "yes" or "no". After these special issues were answered, though the Court could have, without further report from the jury, based its judgment upon the answers given, the inquiry by the Court and the response by the jury shown on page 10 of this Opinion [314 S. W. (2d) 59], constitutes a clear, general verdict in favor of the will. So, in the instant case, it appears that the Trial Judge sustained both the special and general verdicts of the jury, acting as the Judge and the 13th juror.

In will contests, as in other cases tried to a jury, if there is any competent, material and substantial evidence to support the verdict of the jury, the appellate courts will not interfere with that verdict and judgment thereon, in the absence of any error on the part of the trial court, which the appellate court, from the record, cannot determine affirmatively affected the results reached by the jury.

"The same rules apply as to the scope of review in will contests as in other cases at law. The court of appeals will consider only whether there is any material evidence to support the verdict and judgment of the Trial Court." Phillips' Pritchard on Wills and Adm. of Estates, Vol. 1, p. 345, Sec. 377; Flanary v. Lannom, 12 Tenn. App. 236; Parker v. West, 29 Tenn. App. 642, 199 S. W. (2d) 928; Smith v. Smith, supra; Davidson v. Gilreath, supra.

The facts proven upon which the jury based its verdict and the Court pronounced judgment thereon, are as follows:

J. T. Finney, aged 51 years, who with his uncle, Harry T. Atkins, is co-administrator of the estate of John A.

Atkins, deceased, stated that he had known his Aunt, the testatrix, since he was a child of 5 or 6 years of age, and testified that based upon his association with his Aunt, thinks he would recognize her handwriting. His correspondence with her was limited to Christmas cards. He found many checks in her home which are exhibited in this record, the signatures of which he says are all in her handwriting. (R. 39, 40.) . He was not asked to identify the handwriting of the script alleged to be her will.

As co-administrator of the estate of John A. Atkins, deceased, he testified that no effort had been made to conceal any of his papers or effects. In this connection, he was asked and answered the following questions:

"Q. Have you found any such script or document as referred to in this amendment since you have had access to them that would be a part of this will? A. I have run across nothing that I thought might be a part of the will.

"Q. Have you run across anything as alleged in that amended petition? A. I can't believe I have. I have gone through stacks of papers.

"Q. Among either of their papers have you found any such article as set out in this amended petition this morning? A. If I ran across it I was not aware of it at the time, it didn't impress me as being of any value at the time." (R. 41.)

On cross-examination, he stated that John A. Atkins had managed the real estate of his wife, the testatrix. In answer to the question as to what real estate she owned, he referred to a good many tracts of land and pieces of business property. (R. 43.)

Harry T. Atkins testified that he was co-administrator with witness Finney of the estate of his deceased brother, John A. Atkins; that he had lived in Dyersburg about 60 years and personally knew that the relationship between John A. Atkins and his wife, the testatrix, was that of devotion to each other; that generally John A. Atkins looked after the business affairs of his wife; that he was the executor of the will of her mother; that the real estate which Mrs. Atkins owned at the time of her death was generally that left to her by the will of her mother; that John A. Atkins was familiar with that real estate, its location, kind, etc. He further testified that during the administration of his brother's estate, he had never "concealed or suppressed or kept back any instrument such as described in this amended petition". He further testified that he had access to and had been through the papers and effects of his deceased brother and had found no such papers as were referred to in the amended bill.

He was recalled to the witness stand and with respect to the handwriting of the testatrix, he testified as follows:

"Q. Have you seen little or much of her handwriting during that 41 years? A. Lots of it.

"Q. Here is a check dated 8/22/49 for $9.18 signed Mrs. John A. Atkins, is there anything on that that is not her handwriting? A. The signature is hers on that but the Hobbs Jewelry Company is not.

\*　\*　\*　\*　\*　\*

"Q. Here is check No. 323 to Hobbs Jewelry Company, what portion of that check is not in her hand-

writing? A. The signature is hers but the Hobbs Jewelry Company is not."

The two referred to checks were made exhibits 1 and 2 to his testimony. (R. 59.) He was shown the list of checks filed as exhibits and testified that he had gone through the entire list and that the signature on each of them was her genuine signature. He was specifically asked and specifically answered:

"Q. Do you know or think you know the handwriting of Mrs. Louise Brackin Atkins? A. Yes, sir."

The list of checks were filed as exhibits to his testimony over objection of counsel for contestants, and the Court said:

"I am not permitting him to file it as an exhibit to comparison but only an exhibit to his testimony."

This witness was not shown, according to this record, the alleged holograph script or will of Mrs. Atkins, nor was he asked to identify it as her handwriting. Just why he was not asked relative to the handwriting of the will in question does not appear in this record.

The next witness for proponents was Weldon Hart, Assistant Vice-President of First Citizens National Bank. He had been with that bank since 1940, starting as a teller, in which capacity he testified that it was his duty to cash checks and know handwriting. He was handed the list of checks filed as exhibits to the testimony of Harry Atkins and asked if he ever cashed any of those checks. He answered in the affirmative and stated that the checks were in the handwriting of the testatrix. Objection was made to the filing of the checks as exhibits and upon suggestion of the Court he was requested to

select any of the checks that he wished and identify them as an individual item or one that the witness had seen the testatrix write. His testimony is indefinite in that regard because the witness would not say that he had ever seen her write her signature nor would he swear that she ever passed a check in at his window when he was teller. He was then asked by the Court:

"Q. Do you know or think you know her signature? A. I am positive I know her signature.

"The Court: You can ask him about the will.

"Q. I hand you here a paper writing in this record which purports to be a holograph will full and complete in the handwriting of Mrs. Louise Brackin Atkins. It is written on this paper on three pages on the backs of each of them. Will you examine that and state whether or not that is in the handwriting of Mrs. Louise Brackin Atkins? A. Yes sir I would say that was her signature.

"Q. What about the handwriting? A. I would say it is her handwriting.

"Q. Is there any word on the will proper that you would say is in her handwriting, any thing in that purported will you would say was in her handwriting? A. It is the same handwriting at all places, it all looks alike to me and in my judgment of handwriting I would say it is all her handwriting." (R. 54, 55.)

The witness testified that the testatrix was a resident of Dyer County and of sound mind on August 12, 1950.

On cross-examination, this witness was asked and answered:

"Q. Now, Mr. Hart, you say that in your opinion this is Mrs. Louise Brackin Atkins' handwriting. From what do you base that opinion on? A. Mr. Latta I observe handwriting of everyone that does business in our bank, that is part of my responsibility on handling checks and when I worked in the window it was my responsibility to know the signature before I paid a check. (R. 55.)

\* \* \* \* \* \*

"Q. As a matter of fact the only checks you have ever seen were signed Mrs. John A. Atkins wasn't it? A. I believe I wouldn't be positive. I believe she at one time had an account in some other name, her account was Mrs. John A. Atkins, she could have had another account.

"Q. You are basing your opinion that every word of this will is in her handwriting because you think it is her signature? A. Yes sir and observing writing on the checks.

"Q. What usually appears on a check? A. The date, who it is payable to, and the amount and in writing and the signature. (R. 56.)

\* \* \* \* \* \*

"Q. Did you ever have any correspondence with Mrs. Atkins? A. No sir.

"Q. Did you ever see any letters she wrote? A. No sir.

"Q. Have you ever seen her handwriting except on checks? A. No sir.

"Q. When did you first see this purported will here? A. I believe it was presented once before.

"Q. Within the last four or five days was the first time you saw it? A. Yes, sir. (R. 56.)

＊　＊　＊　＊　＊　＊

"Q. That is all you are basing your testimony on is the fact you looked at those checks and this will of pieces of paper? A. Yes sir and my past experience in handwriting and knowing these checks were her checks.

"Q. Lets see how familiar you are with it, read this will to the jury. (Read will of Louise Brackin Atkins to the Jury.)

"Q. There was a lot of it that you couldn't read? A. That is right a lot of it I couldn't see.

"Q. You say you are familiar with her handwriting? A. Yes sir I think I am I can show you what I base my theory on. Pick me out a word beginning with 'w' and one with 's'. Now look at your 'w' and this 's' on the check. If I am any judge of handwriting they are the same.

"Q. Do you want to file that as an exhibit? A. Yes sir I will." (R. 57.)

The check about which he makes comparison is filed as Exh. 1 to this testimony and is dated October 11, 1949, payable to Williams Shade & Awning Co. for $10.36, signed "Mrs. John A. Atkins".

"A. (continued) I am making this statement as to my judgment in handwriting and to the best of my knowledge that is her handwriting on this check and on that will, that will is her handwriting.

\* \* \* \* \* \*

"Q. Would you say you are familiar with her handwriting as a whole or these particular letters? A. The only way I could put that would be as I said before, the only handwriting I would have had access to would have been her checks and my experience of handwriting and from those checks and the handwriting on it. When I pay a check I pay attention to the signature and I was looking at this handwriting and the signature and the handwriting in the will I would say is the same.

"Q. From your experience and knowledge of her handwriting is this all every word written in her handwriting? A. After reading it over from top to bottom it is all the same handwriting I would say from the beginning to the end and I believe that is her handwriting, that is my opinion." (R. 58.)

On re-direct examination by Mr. Latta:

"Q. You didn't see her write it? A. No sir, but in my opinion and my knowledge of handwriting I am positive that is all written by the same person and I am sure it was written by Mrs. Atkins." (R. 58.)

Mrs. Katie Lucas for proponents testified that she had been employed in the First Citizens National Bank at Dyersburg for 36 years as a teller; that it was a part of her duty to know the handwriting and signature of people

who did business with the Bank; that during her 36 years employment it had been a part of her duty to handle checks drawn by Mrs. John A. Atkins; that she was a bookkeeper on the ledger sheet of Mrs. Atkins before she became a teller and that her checks went through there and she entered them. She testified that Mr. Jesse Bradshaw, who was formerly Vice-President of the Bank, had died since Mrs. Atkins' death. She was asked and answered as follows:

"Q. Do you know or think you know her handwriting? A. I think I do.

\* \* \* \* \* \*

"Q. Her checks went through there and you entered them? A. That is right.

\* \* \* \* \* \*

"Q. Is it from that experience that you base your knowledge of her handwriting? A. Yes, sir.

"Q. Will you look at that will and state whether or not that is her handwriting except the notation made by Judge Jones and where it is filed, based on your knowledge of her handwriting as a bookkeeper and teller in that bank, if that is the handwriting of Mrs. Louise Brackin Atkins? A. To my knowledge she wrote it.

"Q. You think that is her handwriting? A. I sure do.

"Q. Has she had a bank account there the past 36 years in some name, whether Mrs. John A. Atkins or Mrs. Louise Brackin Atkins? A. I would think so.

"Q. You have seen checks she wrote come through there that long? A. Yes." (R. 61, 62.)

The witness also testified that Mrs. Anna Sodway Rogers had been in surgery and Beth Chamblen was sick and were unable to appear as witnesses.

On cross-examination, she testified that the extent of the handwriting of the testatrix that she had seen prior to seeing the will of testatrix, was such as appeared on checks and deposit slips made out by testatrix. She also testified that she had carried on no correspondence with Mrs. Atkins, the testatrix. (R. 61-64.)

Mrs. Charles O'Bryan, witness for proponents, testified that she was Assistant Cashier and Trust Officer of First Citizens National Bank; that she had known the testatrix, Mrs. Atkins, for 25 years prior to her death. She stated that a good portion of her work had to do with bonds. She was asked and answered:

"Q. Do you know or think you know her handwriting? A. I believe I do.

"Q. I hand you here what purports to be a holographic will dated August 12, 1950, will you examine that and state whether or not that is totally in the handwriting of testatrix, signature and all except the notations on the bottom or will book and filing markings? A. (Looks at will in detail) To the best of my knowledge and belief that is her handwriting and signature." (R. 65.)

On cross-examination, she was asked and answered:

"Q. Have you ever carried on any correspondence with Mrs. Atkins? A. I don't believe so except we

have had handwritten letters when Mr. John had an operation, she wrote a lengthy letter from Memphis thanking us for flowers.

"Q. Did you have that before you when you identified that as her handwriting? A. That was several years ago and I looked at several of her checks to refresh my memory.

"Q. It was from those checks and from this that you have any recollection of her handwriting? A. I didn't say that, I remember seeing her handwriting.

"Q. Is there anything particular you remember about her handwriting? A. Nothing except it was slightly hard to read." (R. 66, 67.)

The witnesses, Weldon Hart, Mrs. Katie Lucas and Mrs. Charles O'Bryan, are the only ones in the record who testify to the fact that in their opinion the script in question is the holographic will of Mrs. Atkins.

The Trial Judge indicated his satisfaction with the testimony of the witnesses, insofar as their qualifications as witnesses who claimed to know the handwriting of the testatrix and who have identified the script as a holograph of the testatrix. The script itself, in evidence, shows the date and first clause as follows:

"Saturday Aug. 12th 1950.

"I, Louise Brackin Atkins make this my last will and testament—at my death I will", etc.

The first page is not numbered. The remaining pages of the script, in the upper lefthand corner are numbered with the figures "2", "3", "4", "5", and "6", in the same handwriting as the balance of the script. In the last

two lines at the bottom of page numbered "4" and the first five lines and two words in the 6th line at the top of page numbered "5", is the following statement:

"(To my husband John A. Atkins I will the remainder of my of my personal Property and Real Estate, and say that He, John A. Atkins be made executor and administrator of This my Last Will, without Bond or Reports to Court.)"

The first "of my" appearing in above quotation are the last two words on page numbered "4" and the second "of my" in above quotation are the first two words on page numbered "5". In between the above quotes appear bequests of considerable personal property. Also after the last above quote are a number of bequests of personal property and some real estate. Beginning in the last line on page numbered "5" and the first two lines and one word in the third line on page numbered "6", is the following statement:

"I also here with request That John A. Atkins, my husband, carry out every detail of my above requests."

Immediately following that statement is the following:

"I here by commit my soul into the hands of my Savior, full of confidence that, having redeemed it, and washed it with his most precious Blood, He will present it faultless before the Throne of My Heavenly Father. Witness my Hand on this The Twelfth (12th) day of August 1950.

"s/s Louise Brackin Atkins."

As stated hereinbefore in this Opinion, there is a devise to Eliza Ferguson Bishop whom the testatrix refers to as "my colored cook", after which testatrix' name is signed again and the same date as before.

Thus, it would appear that at the time the testatrix prepared the script in question, taking into consideration the very beginning and the ending of it as it appears on the script, she intended it to be her last and whole will.

On the bottom end of the last page of the script, in the handwriting of Judge Jones is the following statement:

"Allowed to Probate this June 19, 1951; testator died domiciled in Dyer Co. Tenn. on May 4, 1951. Holo will—3 Wit. present.

"s/s Robert D. Jones."

With respect to the paper which contained the description of the real estate which the record indicates was owned by the testatrix, and its relationship to the propounded will, the essence of the evidence introduced in that record is found in the deposition of R. E. Rice, the testimony of Judge Robert Jones, and the testimony of Mrs. Verna Mae Haggard. The pertinent parts of this testimony may be summarized as follows:

Mr. Rice had practiced law in Dyersburg approximately 50 years. He had represented Mr. John A. Atkins for 30 or 40 years. Had never represented Mrs. Atkins personally. He was counsel for John A. Atkins as Executor of the Will of Louise Brackin Atkins. He appeared at the probating of the will of Mrs. Atkins. He stated that the will came out of the lock box of John A. Atkins,

who kept two lock boxes, one of which was filled with deeds and deeds only, and the other was filled with all kinds of papers in it, including cash. In the box with the will was considerable jewelry and cash. The box was taken from the vault to his office. It was there opened and the contents examined in the presence of Mr. Jesse Bradshaw, then Cashier of the Bank, Mr. Harry Watkins, an auditor, John A. Atkins, husband of the testatrix, Judge Harry Jones, and Mrs. Haggard, secretary to Mr. Rice. Inventory was made of the personal property contents of the box. He had never seen the purported will until it was being taken from the box. He presumed it was in the handwriting of Mrs. Atkins. He did prove the handwriting in the probate of the will in common form by Mr. Jesse Bradshaw, Mrs. Beth Chamblen and Mrs. Rogers, all of whom were employees of the Bank. As to other papers in the box, he said:

"A. In that lock box also was a memorandum setting out the location of the different lands that Mrs. Louise Atkins owned and I thought it might belong in that will and the pages wasn't numbered and nothing to indicate it would belong to the will and it was determined it was just a memorandum for John Atkins.

"Q. That wasn't probated? A. No.

"Q. Nothing was probated but the holographic will? A. That is right. We looked at the memorandum quite a while wondering whether or not it belonged in the will and we decided it did not." (R. 72.)

Judge Jones testified for contestants and said that he went to Mr. Rice's office on the day the will was taken from the lock box. He was asked and answered as follows:

"Q. Do you recall on that day whether or not there was a will found in that box? A. Well, to answer it it would be necessary to give a series of facts. By appointment I met Mr. Rice, Mr. Bradshaw and Mr. Atkins and went up the elevator after Mr. Bradshaw got the box and we sat down in Mr. Rice's office at a table and there were six of us present and his secretary was there and Jesse opened the box and handed them out and everybody looked at that and Mrs. Haggard made an entry of every item contained in it and we all signed it. The only thing I remember is that I made a statement it didn't look like all the will was there and Mr. Atkins said well, my wife either had someone to bring it to her, I don't have any independent recollection of that." (R. 80.)

And further:

"Q. The first time you saw this was when it was brought to your office for probate? A. From my independent recollection.

"Q. What did you do then? A. We completed the listing of the contents like we do in all cases and we got through at noon and if the will in there had been given by Mr. Bradshaw to Mrs. Haggard I don't know about it. The first time I remember seeing it was when he and Mr. Bradshaw and Mr. Rice by appointment came in the office with several witnesses." (R. 81.)

He was further asked:

"Q. I hand you herewith a script purporting to be the will of Louise Brackin Atkins and I will ask you if that is all that was brought into your office by Mr. Rice as attorney and Mr. John Atkins, as Executor, when the will was probated? A. That has been five years ago. Insofar as at the time I considered the will I haven't read all of it I will say it was for the reason that I have a notation on the back of it in pen. I do think perhaps there was a memorandum or listing of certain real estate but I didn't consider it a part of the will. I think the memorandum had a list of real estate holdings but I didn't consider it as a part of the will, if I had I would have issued notice.

"Q. Was that other sheet you were talking about brought to your office for probate? A. As I remember it there was a sheet with it but that has been a long time ago.

"Q. Do you know what became of that sheet? A. No, sir." .(R. 81.)

On cross-examination, he was shown the list of personal property and said that was his signature on it. With respect to the memorandum of real property he was asked and answered:

"Q. Now Judge you say there was some memorandum of real estate? A. As I remember it.

"Q. You didn't consider it as a part of the will? A. I have stated what I remember about it. As I said to the best of my memory there was a sheet of paper that reflected the real estate holdings and I probated those sheets that are here and not that.

"Q. Do you know in whose handwriting that paper was? A. No, sir.

"Q. Was it signed by Mrs. Louise Brackin Atkins? A. I looked over it closely but I didn't give it too much thought because I didn't think about testifying about it, it was just a list of property and that was all I considered it.

"Q. Was it attached to that or just in the box? A. They just put it down on the table in the office there by itself.

"Q. Was it attached to his instrument here? (Meaning the will in question.) A. It was lying with it but it was loose and separate.

"Q. You didn't consider it a part of the will? A. No sir I would have included it if I had." (R. 81, 82.)

Mrs. Verna Mae Haggard, witness for contestants, stated that she was secretary to Mr. Rice, and the lock box was opened in his office in the presence of R. E. Rice, Judge Jones, Jesse Bradshaw, Harry Watkins, John A. Atkins and herself, and they all went through the papers. She typed a list of personal property and all of them signed it. She was handed a list—the signed and exhibited list of personal property—which she said was only a part of the list she typed. She was handed the will in question, and said that she saw that one or another one like it. She was asked and answered as follows:

"Q. At the time that box was there and all those people were there some other papers attached to this, some memorandum attached to those pages here? A. Do you mean other pieces of paper?

"Q. Yes. A. To the best of my knowledge there was some pieces of paper there with descriptions of property.

"Q. They were along with this? A. I don't know whether it was a portion of the will or not.

"Q. There were some other papers? A. There was were some more papers.

"Q. To the best of your recollection what did those other papers contain? A. I don't remember anything but descriptions of property.

"Q. That is all you remember is the description of some real estate? A. That is right." (R. 75.)

She stated that Mr. Rice just picked up the other papers and read them and put them down. Said Mr. Rice handled them and she did not know what became of them. (R. 77.)

On cross-examination, she identified the script as being the one taken from the box. She does not know whether Judge Jones examined it or not. She did not know Mrs. Atkins' handwriting. She does not know whether the other papers mentioned were attached to or clipped to the script. She says she knows there is another piece of paper but she does not know if it was signed by anybody and she does not know whether it was in handwriting or typewritten. Just knew that it had some descriptions of land or real estate on it.

Mrs. Sadie Lanier, Deputy Clerk of office of Court of Common Law, testified that the papers which were filed with the Circuit Court were all she found in her office. She was not working at the time the will was probated in common form and did not record the will but she had

been unable to find anything in the office other than the papers filed.

At the conclusion of all the evidence, motion was made for directed verdict by contestants, that motion being to direct the jury to answer question No. 1 "Yes", to answer question No. 2 "No", and to answer question No. 3 "No". The motion further was that the Court instruct the jury

"to find against the will because there is no competent evidence proving that the purported script is entirely, completely and wholly in the handwriting of the deceased Louise Brackin Atkins, and that there is no proper nor competent evidence proving such handwriting * * * will was not found among valuable papers * * * said will has been concealed or suppressed and not probated herein and cannot be the whole and complete will * * * suppression and concealment was fraudulently done by the principal beneficiary and executor * * *." (R. 85, 86.)

Motion was overruled and exceptions preserved.

By several of the Assignments of Error, it is the contention of the contestants that Mrs. Louise Brackin Atkins did not intend the involved script to be her whole will and that there is no evidence upon which the jury could so find.

Perhaps there is no better treatise in any of our cases upon question of intent or animus testendi than that found in the case of Smith v. Smith, supra, in an Opinion by the late Presiding Judge of this Court, Hugh C. Anderson, and which is quoted from and referred to in the case of Davidson v. Gilreath, supra. The Opinion in

Smith v. Smith was written soon after the passage of the Acts of 1941. In that case the verdict of the jury was against the will, and this Court sustained the verdict of the jury. In Davidson v. Gilreath, there was a verdict in favor of the will and judgment thereon. The verdict was set aside and judgment entered sustaining contestants' motion for directed verdict against the will.

It is true that in neither of the cases was it contended that any supplemental or loose sheet of paper constituted any part of the contested will. In both cases the wills were holographs and there was no contention that any sheet or part of either will was not offered for probate, such as we find in the instant case. However, the same rules are applicable with respect to the issues to be submitted to the jury. Each of those cases turned upon the pure question of intent of the testator to make and leave a script as a will.

In Smith v. Smith, supra [commenting upon the Acts of 1941, with respect to proving holographs, and that prior thereto the script must have been found among the valuable papers of the testator after death or lodged in the hands of another for safekeeping, it was said [33 Tenn. App. 507, 232 S. W. (2d) 342]:

"As has been seen, the present statute dispenses with the requirement that the propounded instrument must have been found among the valuable papers of the decedent or lodged in the hands of another for safe-keeping; but under the general rules of evidence, the place where the propounded paper was kept by the writer and found after his death, is still a circumstance of no little probative value to be considered along with all of the other facts and cir-

cumstances upon the question of whether he intended it to operate as a will. In short, the effect of the statutory provision was to reduce the place of deposit from an essential factor to an evidential circumstance relevant to the animus testandi. The weight to be given it is primarily for the jury and generally will depend upon the accommodations and arrangements of the alleged testator. Cf. Tate v. Tate, 30 Tenn. 465.''

Commenting upon the fact that the jury found against the will in the Smith case, the Opinion states:

''The jury were fully justified in finding that the instrument was not discovered among the valuable papers of the decedent, but under circumstances which negatived the idea that he regarded it as being of any value or intended it to be effective as a disposition of his property. In addition, the informality of the instrument as demonstrated by the type of paper upon which it was written, the fact that it was written with a pencil, the abbreviations, interlineations and erasures; the syntax, and the memorandum-like characteristics of the language, when considered in the light of the business training, the habits and the accommodations of the deceased, all tended to support the view that he did not regard the instrument as a completed one in the sense that he intended it to operate as his will.''

In the case of Davidson v. Gilreath, supra, commenting upon the facts in connection with that will, the Court said [38 Tenn. App. 291, 273 S. W. (2d) 722]:

''We do not think the minds of reasonable men could differ on the ultimate question here presented.

We hold, therefore, that the evidence establishes the fact, with no evidence to the contrary, that Mrs. Bright did not intend for this script to be her will; that she drew the lines through certain portions of it; crossed out another item; never had it witnessed; that it was incomplete and unfinished without the witnesses; and discarded it as a worthless piece of paper by putting it in the junk room as junk. It is our opinion that no person of reasonable mind would reach the conclusion that Mrs. Bright put the rest of her valuable papers in the drawers of the sideboard of the room in which she lived, under lock and key; and took her will, one of her most valuable papers, two or three rooms and three or four doors away and put it in a plunder room which contained the articles stated above.''

In both the Smith case and the Gilreath case, the rule is most positively stated, citing a number of authorities, as follows:

"If the animus testandi be doubtful, all the facts or circumstances may be looked to, and it is for the jury to determine from all the evidence, intrinsic or extrinsic, whether or not the testator intended the instrument to operate as his will. Sizer's Pritchard on the Law of Wills and Administration, Section 232; Crutcher v. Crutcher, supra (30 Tenn. 377); Marr v. Marr, supra (39 Tenn. 303); Hopper (Hooper) v. McQuary, supra (45 Tenn. 129); McCutcheon (McCutchen) v. Ochmig, supra (60 Tenn. 390); (R. B.) (Douglass (& Co.) v. Harkrender, supra (62 Tenn. 114); Reagan v. Stanley, 79 Tenn. 316; Pulley v. Cartwright, 23 Tenn. App. 690, 137 S. W. (2d) 336.''

In Phillips v. Newport, 28 Tenn. App. 187, 202, 203, 187 S. W. (2d) 965, 971, quoted in Davidson v. Gilreath, supra, it is said:

"Any fact may be proved by direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. In civil cases facts are proved by a preponderance of the evidence. If unequal conflicting probabilities, or unequal inconsistent theories are shown by the evidence; or if the minds of reasonable men might differ from the proved facts as to whether the conflicting probabilities, or inconsistent theories, are equally supported by the evidence, the case must go to the jury. Law v. Louisville & N. Railroad Co., 179 Tenn. 687, 699, 170 S. W. (2d) 360; New York Life Insurance Company v. Nashville Trust Co., 178 Tenn. 437, 159 S. W. (2d) 81; Bryan v. Aetna Life Insurance Co., 174 Tenn. 602, 130 S. W. (2d) 85; Knights of Pythias v. Steele, 107 Tenn. 1, 63 S. W. 1126; Pickard v. Berryman, 24 Tenn. App. 263, 142 S. W. (2d) 764; Gifford v. Provident Life Ins. Co., 16 Tenn. App. 21, 64 S. W. (2d) 64; Jones Commentaries on Evidence, Second Edition, Revised and Enlarged, page 23, section 12."

With the rules laid down as hereinbefore stated in this Opinion, let us look at the facts now before us.

Mrs. Atkins' mother was Mrs. J. M. Brackin. It is shown in the proof that much of the real estate owned by Mrs. Atkins was devised to her by the will of her said mother. A certified copy of the will of Mrs. Brackin, dated November 16, 1929, and shown to have been probated on October 10, 1933, was ordered filed by the Trial Judge, on motion of contestants, as evidence in the instant

case. This was evidently done because in that will Mrs. Brackin not only gave her daughter considerable real estate but she also named her son-in-law, John A. Atkins, as executor thereof without bond. Perhaps it was ordered filed in order to show that John A. Atkins, having lived with his wife so long and known about her property and having been the executor of his wife's mother's will, knew all about the location of the real estate belonging to his wife and it was not necessary for his wife to have some memorandum of the description thereof in the same place where her will was found, unless she meant for that to be a part of her will. Regardless of the purpose of filing it in the instant case, it is significant to note that while Mrs. Brackin's will is a witnessed will, the first clause in it is that:

"First, I commit my soul in the hands of my Savior, full of confidence that, having redeemed it and washed it with His most precious blood, He will present it faultless before the throne of my Heavenly Father."

This is almost the identical language in practically the last clause in the will of Mrs. Atkins. According to all the witnesses in this case who appeared in the office of attorney Rice, the will of Mrs. Atkins was taken from the lock box of John A. Atkins, the executor, and to whom she had given her real and personal property, except the special bequests and devises found in the script. He had two of these lock boxes. There were no children except the little one who died in infancy. They had long been married. They were happy. They were devout Christians. They owned extensive properties. They have confidence in each other. His lock boxes were in

the same bank vault of the bank where she did her banking business. The high-ranking officials of the bank went with him to the office of Mr. Rice when the will was taken from his lock box. Considerable personal property, including U. S. bonds, of which $5,525 face value were payable to her and her husband jointly and corporate stock certificates in various corporations, according to the list filed in this case, were there in the box with this will. Mr. Rice studied the memorandum of real estate descriptions, which for some reason is now lost, at the same time he was studying the will. He concluded there was no part of that memorandum which could constitute a part of her will, or was intended by her as such.

Judge Robert D. Jones of the Probate Court saw that same paper at the same time as did Mr. Rice first see it. He thinks he saw it later when the will was offered for probate in his Court and he considered that paper no part of the will. He admitted the holograph on the three sheets of paper to probate in common form as the last will of Mrs. Atkins. He made a notation in his own handwriting to that effect at that time. He stated it was almost five years from the time the will was probated until the date his testimony was taken. He admitted the will to probate upon the proof presented to him by the then Jesse Bradshaw, Vice-President of that bank who is now dead, and two lady employees of the same bank, each and all three of whom he adjudged to be "well acquainted with the handwriting of the testatrix, all being duly sworn, do state and swear that the purported last will and testament of Mrs. Louise Brackin Atkins was written entirely in her handwriting, and in no one else's handwriting." (R. 27.)

It appears to us that it has been established as a fact that the will was with valuable papers of Mrs. Atkins and was so found after her death. Even if it could be said that it was not with her valuable papers, what place would be more reasonable for her to have placed and kept it than in the lock box of her husband in the bank where she did her banking business and where he also did his banking business? What other person would she have entrusted it to for safekeeping than her husband?

It is intimated that John A. Atkins was guilty of fraud in failing to produce the memorandum of real estate for probate as a part of her will. If it was a part of her will and John A. Atkins had wanted to defraud anybody, it certainly can be inferred that he had access to both of his lock boxes and he knew that both the script and the description of the real estate were there. He did not have to show it to Mr. Rice, his lawyer, if he had wanted to fraudulently destroy it. He did not have to show it to Judge Jones. He did not have to take it to Judge Jones' Court for probate, as Judge Jones says he thinks he did. No witness says it was signed. No witness says it was in the handwriting of Mrs. Atkins. No witness says it was attached to the will. He had the advice of counsel. It certainly can be inferred that he had the well-considered judgment and decree of Judge Jones, all to the effect that it was no part of the will. Why should he have been careful to preserve it or offer it for probate? If it could be ascertained from the proof —which it cannot—that Mrs. Atkins wrote the memorandum-descriptions of the real estate, when it was done cannot be determined from the proof. It could have been done long before the will was written by her. It could have been done for the purpose of keeping up with taxes,

assessments thereof, or insurance on the real property improvements, for the benefit of herself or her husband in taking care of such matters. ·

■ Counsel for contestants has filed a voluminous brief in which he has practically briefed the law of wills and all the decisions of our own courts as well as courts of other states, and texts. His brief is an excellent brief, but without referring to the many, many cases which he cites, we are constrained to say that they have no application to the present litigation and the proven facts relative to the will under contest. There is no substantial proof in this record that a will, part of a will, codicil, or lost will ever existed or has been suppressed. The Trial Court found the witnesses competent to testify to the handwriting of the testatrix. The jury so reported in its verdict and resolved the issues favorable to proponents and the will. We think the Trial Court was correct in denying the motions for directed verdict in favor of contestants, and that the verdict of the jury and the judgment of the Court thereon is supported and sustained by the evidence, both direct and circumstantial. Therefore, Assignments of Error I, II, III, VI, and XII are overruled.

■ This brings us to Assignment of Error XI copied in full on page 11 of this Opinion, and attacking the refusal of the Trial Court to give the special request there shown.

In the first place, it is not shown in this record that such a request was made to the Trial Court, nor is it shown that such a request was refused by the Trial Court. In the motion for a new trial, this exact request is set out as a ground but nowhere else in the bill of exceptions is

it shown that such request was ever offered or refused, if offered. For that reason alone, this Assignment of Error XI would have to be overruled. We prefer however, to say and to hold that it should be overruled for other reasons. In other words, it does not charge the law.

When the execution of the script had been proved as provided by law, the presumption prevailed that it was her whole will, and the burden of showing that the propounded script was not the whole will of the testatrix, was upon the contestants, or the parties who sought to impeach the will. The Trial Court very properly so charged the jury. He said to the jury in his General Charge:

"The contestants insist in their plea and in the proof in this case that the deceased, did not intend the paper writing as it is and as it is offered on probate to be her will, they insist that if she in fact executed the paper writing it was only a part of the whole will, and that there was other papers pertaining to the property, attached thereto, or found along with the paper writing which purported to be her will; that the other paper writing was never presented to the proper probate Judge for probate with the paper writing, and that therefore it was not the whole will and was not, taken alone intended by her to be her last will and testament.

"If you should find from the evidence in this case the paper writing offered for probate was the last will and testament, of the deceased Louise Atkins, and was intended to be such by her, then the legal presumption of law is that it was the whole will, and

the burden of overcoming the legal presumption that it was her whole will, and intended as such by her to be her last will and testament, is upon the parties seeking to impeach the will.

"A will however may be written on separate pieces of paper and may be probated, or a paper writing may be incorporated into a will by proper reference thereto, but a writing sought to be incorporated in a will must not only be in existence at the time of the execution of the will, but must also be described therein as existing at the time." (R. 89.)

Again he said:

"So if you find from the evidence in this case that the paper writing purporting to be the will of the deceased Louise Atkins was executed and written by her in her own handwriting and was intended to be her last will and testament and her handwriting and signature was properly proven by two credible witnesses, and that at the same time she executed another paper writing as a part of this paper writing and explaining the disposition of the real estate, and intended by her to be part of her will, and was wholly in her own handwriting and signed by her as her act and deed, and necessary it be probated to carry out her last will and testament, and without it this paper writing offered for probate would not be her whole and last will and testament, then you are instructed your verdict would be against the will." (R. 90.)

The general charge was imminently fair and proper to the preservation of all the theories and rights which contestants might have had submitted to the jury. There

is no reference in the will offered for probate to any other document, writing, sheet, desire or expression, shown to be existing simultaneous with the will, nor is there any evidence that any referred to additional sheets, documents or requests of the testatrix were executed by her after making her will, as shown by the propounded script and intended as a codicil thereto.

In Phillips' Pritchard on Wills, Vol. 1, p. 243, Sec. 234, it is said:

"Since all the material provisions of a holographic will must be in the handwriting of the testator, no other document can be incorporated into a holographic will by reference."

In Page on Wills, Vol. 1, p. 699, Sec. 387, it is said:

"A holograph cannot incorporate another instrument which is not entirely in the handwriting of testator."

In Thompson on Wills, 3d Ed., Section 189, p. 294, it is said:

"A separate instrument can not be incorporated into a will, and be admitted to probate with the will, unless it is in existence, and unless it is referred to in the will in a manner which will clearly identify such instrument."

In Howell v. Moore, 14 Tenn. App. 594, 633, in an Opinion by the late Judge Faw, he quotes with approval Alexander on Wills, Section 465, as follows:

"Since a holographic will must be entirely written by the testator, an extrinsic document cannot be incorporated into such a will by reference unless it is

wholly in the handwriting of the testator himself. Any other paper incorporated into a will becomes a part thereof, and if not written by the testator, the whole will cannot be said to be by his hand.''

He also quotes with approval the above quotation from Page on Wills.

It seems to us to be the holding of our Court in Howell v. Moore, that an extrinsic document not in the handwriting of the testatrix cannot lawfully be incorporated as a part of a holographic will in lieu of the plain wording of our statute prior to 1941, which held that every part of the holograph had to be in the handwriting of the testator, and since 1941 that the essential part of the holograph had to be in the handwriting of the testator.

In Pritchard on Wills, the author supports the quotation hereinabove shown with the case of Howell v. Moore, supra, and 17 Tenn. Law Review 445; Annotation, 173 A. L. R. 568.

All Assignments of Error are overruled. The verdict of the jury and the judgment of the Court thereon are affirmed and this case is remanded to the Circuit Court of Dyer County, Tennessee, where the judgment of that Court will be certified to the Common Law and Chancery Court of Dyer County. A judgment will be entered in accord with this Opinion and the contestants, who are plaintiffs-in-error, together with the sureties on their cost bond, will be taxed with the costs of this case in this Court and the costs in the Trial Court will follow the judgment of that Court.

Carney and Bejach, JJ., concur.